[L.A. No. 30049. In Bank. Apr. 3, 1973.]

ELAINE REECE WINT et al., Plaintiffs and Appellants, v.
FIDELITY AND CASUALTY COMPANY OF NEW YORK et al.,
Defendants and Respondents.

## COUNSEL

Casey, McClenahan & Fraley, George R. McClenahan, Hollister, Brace & Angle, Robert O. Angle and Leonard Sacks for Plaintiffs and Appellants.

Robert E. Cartwright, Edward I. Pollock, Theodore A. Horn, Marvin E. Lewis, William H. Lally, Joseph W. Cotchett, Herbert Hafif, David Daar and Siegfried Hesse as Amici Curiae on behalf of Plaintiffs and Appellants.

McInnis, Fitzgerald, Rees & Sharkey, Laurence L. Pillsbury, Kirtland & Packard, Harold J. Hunter, Jr., Donald M. Stone and Stanley W. Legro for Defendants and Respondents.

## OPINION

**McCOMB, J.**—Plaintiffs appeal from a judgment in favor of defendant insurance companies in an action brought by plaintiffs against them on certain claims assigned to plaintiffs by Richard McGregor as part of a stipulated judgment in plaintiffs' favor against McGregor.

*Facts:* Some time in 1960, McGregor and his wife leased from Ed Fletcher Company a 12-acre parcel of land, containing a house, which they occupied, a riding ring, bleachers on each side of the riding ring, a

small office structure, a cook's shack, a hay barn, paddocks, and a stable. The 12-acre parcel was surrounded on three sides by a 500-acre pasture, which was completely fenced, with one chained and locked gate on the exterior perimeter and another gate between the pasture and the 12-acre parcel. The only structure on the 500-acre pasture was a windmill.

On the 12-acre parcel, McGregor, for profit, trained and broke horses, trained riders, advised owners and riders with respect to horses, showed horses, and carried on similar activities. He also bred quarter horses. The 500-acre pasture was used only for grazing horses, some of which belonged to McGregor and some to other persons, who paid McGregor for keeping them there. He charged between $15 and $25 per month for the use of the pasture for grazing. McGregor occupied the 12-acre parcel as lessee under a written lease and used the 500-acre pasture as a licensee under an oral license.

Some time during the night of June 29, 1963, or early morning hours of June 30, 1963, while McGregor was away from the premises at the Del Mar Fairgrounds, several of the horses kept in the pasture for grazing, including some owned by McGregor, escaped therefrom, someone apparently having left the gate open. One of the horses, owned by Dr. Ben F. Zundel, went onto Fletcher Parkway, where a car driven by James Donald Reece collided with the horse about 2 a.m. on June 30, 1963. Both Mr. Reece and the horse were killed in the accident. Mr. Reece's widow (now Mrs. Wint) thereafter, individually and as guardian ad litem of the decedent's minor child, brought a wrongful death action against McGregor, Dr. Zundel, and the Ed Fletcher Company.[1]

At the time McGregor entered into possession of the property in 1960, a policy of liability insurance, written by Great American Insurance Company (Great American), was assigned to him from a previous tenant. The Great American policy was a primary policy, with limits of $10,000/$20,000, and covered McGregor for the "business liability" of his "riding club." McGregor also acquired coverage under an "excess" policy, with limits up to $100,000, written by another insurance company; but six months after the commencement of his lease term he allowed that coverage to lapse. The Great American policy was renewed from year to year and was in effect at the time of the accident.

On February 10, 1963, through Venberg and Robson, a corporate insurance agency in San Diego, McGregor acquired coverage under a

---

[1]The action was subsequently dismissed, with prejudice, against both Dr. Zundel and the Ed Fletcher Company.

$100,000 limit "Farmer's Comprehensive Personal Liability Policy" issued by defendant The Fidelity and Casualty Company of New York (Fidelity). That policy was also in effect at the time of the accident. McGregor testified that before the policy was issued, he explained to the broker that he wanted coverage for all the activities in which he was involved personally, but did not want bleacher insurance, as he was already covered for that and did not want to incur additional expense with respect thereto.

Dr. Zundel was covered under a homeowner's policy issued by defendant Glens Falls Insurance Company (Glens Falls). That policy specifically provided that the word "Insured" also included "with respect to animals . . . owned by an Insured, any person or organization legally responsible therefor . . . ."

McGregor requested a defense of the action from the three insurers, but only Great American, with a $10,000 maximum liability, provided a defense for him. After negotiations, an $80,000 stipulated judgment was entered against McGregor alone; and, as part of the judgment, McGregor assigned to plaintiffs all claims he might have against Fidelity and Glens Falls, plaintiffs agreeing not to seek personal liability from McGregor. Great American paid its $10,000 portion of the $80,000 judgment. Plaintiffs, as assignees, then instituted the present action against Fidelity and Glens Falls to recover the $70,000 balance, claiming (1) that the insurers were liable for the decedent's death under the terms of their policies and (2) that, in any event, they were liable for the settlement payments as a result of their wrongful refusals to defend the initial action. Judgment was entered in favor of the insurance companies and the insurance agency, and plaintiffs appealed.

*Questions:* First. *Is Fidelity liable to plaintiffs under the facts herein?*

*Yes.* If there is potential liability on the part of an insurer under a policy of insurance, there is a duty to defend, and the insurer is liable for all damages reasonably incurred by the insured in the event of a failure to defend. (*Gray* v. *Zurich Insurance Co.,* 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168].) As will hereinafter appear, such potential liability existed in the present case. Moreover, the policy can reasonably be interpreted to provide actual liability by the insurer; and, under well settled rules of construction, any ambiguity must be construed against the insurer. (*Universal Underwriters Ins. Co.* v. *Gewirtz,* 5 Cal.3d 246, 250 (1) [95 Cal.Rptr. 617, 486 P.2d 145]; *Paramount Properties Co.* v. *Transamerica Title Ins. Co.,* 1 Cal.3d 562, 569 (2) [83 Cal.Rptr. 394, 463 P.2d 746].)

Under its policy, Fidelity agreed "[t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage, and . . . [to] defend any suit against the insured alleging such bodily injury or property damage and seeking damages which are payable under the terms of this policy, even if any of the allegations of the suit are groundless, false or fraudulent . . . ."

Fidelity's refusal to defend McGregor in the wrongful death action was based on its claim that the damages sustained as a result of the escape of the horses from his pasture were excluded from coverage under an exclusionary clause which provided that the policy was inapplicable "to any business pursuits of an insured, except . . . activities therein which are ordinarily incident to nonbusiness pursuits . . . ."

Under the language of the policy, coverage is provided if an injury resulted from (1) a nonbusiness pursuit or (2) from a business pursuit which is also ordinarily incident to a nonbusiness pursuit. As will be seen, there is a basis for finding at least potential liability under either alternative.

Thus, although the pasturing of horses for a fee would normally be regarded as a business pursuit, Fidelity's policy specifically defines "business" to include "trade, profession or occupation, *other than farming* . . . ." (Italics added.) While McGregor's "riding club" venture may well be considered beyond any reasonable interpretation of "farming," the broad term "farming" is not limited merely to the cultivation of the soil, but includes, in addition, the raising and *grazing* of animals. (See, e.g., *Security-First Nat. Bk.* v. *Pierson,* 2 Cal.2d 63, 64-65 [38 P.2d 784].) It is not entirely clear from the record how closely interrelated the "riding club" and "grazing" activities may have been; but, in view of the broad reach of the policy's undefined "farming" terminology, coverage or noncoverage of the grazing activities appears to be, at the very least, ambiguous, thus subjecting the insurer to liability.

It is worthy of note that the policy is not an ordinary homeowner's comprehensive personal liability policy, but, rather, a *"Farmer's* Comprehensive Personal Liability Policy." (Italics added.) According to McGregor's testimony, he described to the insurance broker the nature of his riding club and grazing activities. There is nothing in the record to indicate that McGregor engaged in any other farming activities; and to exclude the entire grazing operation would cut the heart out of the special coverage afforded by this farm-oriented comprehensive policy. As hereinabove stated, the policy fails to define "farming," and grazing can reasonably be inter-

preted to constitute a farming operation. Consequently, the nonfarming business exclusion is inapplicable, since, as pointed out above, any ambiguity must be construed against the insurer.

Even, however, if McGregor's "grazing for hire" activities were regarded as nonfarming pursuits, they would still be covered as a result of the exception to the "business pursuits" exclusion, under which there is coverage for business injuries which are caused by activities "ordinarily incident to nonbusiness pursuits." By the terms of the policy, "nonbusiness pursuits" include normal farming activities; and the acts of keeping fences and gates repaired and closed are ordinarily incident to normal farming activities. Hence, injuries resulting from a failure to keep farm gates closed, as here, would appear to be within the coverage provided by the policy. (See *Crane* v. *State Farm Fire & Cas. Co.,* 5 Cal.3d 112 [95 Cal.Rptr. 513, 485 P.2d 1129, 48 A.L.R.3d 1089].)

Fidelity argues that even if it was under a duty to defend McGregor, its failure to do so was of no consequence, because Great American defended him, and he therefore was not prejudiced. Great American's policy, however, had a $10,000 limit, and a defense by an insurer whose policy has a limit far below the amount claimed cannot be equated to the defense of an insurer who stands to lose 10 times as much as the insurer who defends. This court has, in fact, held that where more than one insurer owes a duty to defend, a defense by one constitutes no excuse of the failure of any other insurer to perform. (*Continental Cas. Co.* v. *Zurich Ins. Co.,* 57 Cal.2d 27, 37 [10] [17 Cal.Rptr. 12, 366 P.2d 455].)

Since, as hereinabove shown, there was potential liability under the policy and Fidelity's refusal to defend was unjustified, Fidelity is liable for its proportionate share of the judgment (*Campidonica* v. *Transport Indemnity Co.,* 217 Cal.App.2d 403, 409[8] [31 Cal.Rptr. 735] (hg. den.); *Walters* v. *American Ins. Co.,* 185 Cal.App.2d 776, 786 [8 Cal. Rptr. 665] (hg. den.)), subject, however, to its right to litigate on remand the remaining issue raised by the pleadings as to whether the settlement was collusive or fraudulent.

■ Second. *Is Glens Falls liable to plaintiffs under the facts herein?*

*No.* Although the same legal principles are applicable to determine whether Glens Falls had an obligation to defend McGregor in the wrongful death action, the factual situation is entirely different. It will be recalled that the Glens Falls policy was a homeowner's policy written on behalf of the owner of the horse, Dr. Zundel, as the named insured and that McGregor claimed to be an additional insured under the definition of

"Insured" hereinabove referred to.[2] Like the Fidelity policy, the Glens Falls policy contains an exclusionary clause making the policy inapplicable "to any business pursuits of an Insured other than . . . activities therein which are ordinarily incident to nonbusiness pursuits . . . ." "Business," however, is defined to include "trade, profession or occupation," with no exception relating to farming activities. Farming for profit must, therefore, be regarded as a business pursuit; and, since the grazing of animals is included in the broad term "farming," and McGregor charged for the grazing, he was engaged in a farming operation for profit. Consequently, the failure to keep farm gates closed must be considered an act incident to a business pursuit and within the terms of the exclusionary clause hereinabove quoted, as a result of which there is no coverage for McGregor under the Glens Falls policy. Since gates are only infrequently used in nonbusiness pursuits, keeping them closed is not an act which is ordinarily incident to nonbusiness pursuits. The analogy between the present case and *Crane* therefore does not exist with respect to the Glens Falls policy.

Further clauses in the policy reinforce the conclusion that McGregor was not an additional insured thereunder. For instance, the definition of "premises" specifically excludes farm land owned by, or rented to, an insured; and the policy provides that if three or more spaces in stables are held for rental, the property constitutes "business property" within the meaning of the policy.

Under the circumstances, there being no ambiguity with respect to the exclusion of activities relating to farming, it remains only for us to determine if under the language of the policy the insurer has led the insured reasonably to believe that a defense would be provided.

In *Gray,* this court indicated that in an insurance contract written by the more powerful bargainer (the insurer) to meet its own needs and offered to the weaker party (the insured) on a "take it or leave it" basis, the reasonable expectations of the latter may have significance in determining whether the former owes a duty to defend. In *Gray,* we found that the policy did not clearly define the application of the exclusionary clause to the duty to defend, that the exclusionary clause was unclear, and that the insured could reasonably have expected that the protection he had purchased included a duty to defend him. The person being sued in *Gray,* however, was the named insured, who had purchased and paid for the protection afforded by the policy. It is to the reasonable expectations of

---

[2]The policy provides: "The word 'Insured' also includes . . . with respect to animals . . . owned by an Insured, any person or organization legally responsible therefor . . . ."

such a person that we must look in making our determination whether the protection includes the right to a defense. In other words, under the Glens Falls policy we must consider what the reasonable expectations of Dr. Zundel were—not the reasonable expectations of someone claiming to be an additional insured thereunder. In analyzing the situation, we have concluded that it would be unreasonable for Dr. Zundel to have assumed that part of the premium he paid for the policy was to purchase the protection of a defense to someone claiming to be an additional insured, when such person, because of a clear exclusionary clause in the policy, actually had no basis for sustaining his claim of being covered thereunder. Furthermore, our holding in *Gray* is premised upon a finding that the policy provisions reasonably led the insured to expect to be defended. Here, McGregor had never seen the policy and probably did not even know of its existence, and hence cannot claim that it reasonably led him to expect to be defended. Under the circumstances, the trial court properly found in favor of Glens Falls.

■      Third. *Should the judgment insofar as it finds in favor of Venberg and Robson, the insurance agency, be affirmed?*

*Yes.* Although plaintiffs appealed from the entire judgment, they failed to urge any error in law which would support a reversal of the judgment insofar as it finds in favor of the insurance agency. Under the circumstances, since it is counsel's duty by argument and citation of authority to show in what respects rulings complained of are erroneous (see *Greenstone* v. *Claretian Theo. Seminary,* 173 Cal.App.2d 21, 35 [21] [343 P.2d 161]), the attack on the judgment insofar as it finds in favor of the insurance agency may be deemed to have been abandoned (*Sutter* v. *Gamel,* 210 Cal.App.2d 529, 531 [2] [26 Cal.Rptr. 880]; *Utz* v. *Aureguy,* 109 Cal.App.2d 803, 806-807 [241 P.2d 639]).

The judgment, insofar as it finds in favor of Glens Falls and Venberg and Robson, is affirmed and, insofar as it finds in favor of Fidelity, is reversed and remanded for proceedings consistent with the views hereinabove expressed.

Tobriner, J., Mosk, J., Burke, J., and Kaus, J.,* concurred.

**SULLIVAN, J.,** Concurring and Dissenting.—I agree with the conclusion of the majority that the judgment below should be affirmed insofar as it is in favor of defendants Glens Falls Insurance Company and Venberg and

---

*Assigned by the Chairman of the Judicial Council.

Robson, but I strongly dissent from the majority's further conclusion that the judgment should be reversed insofar as it is in favor of defendant Fidelity and Casualty Company of New York. It is my view that the majority, by wrenching the terms of the Fidelity policy beyond all recognition and conveniently ignoring relevant trial court findings, have employed procrustean reasoning to make the record fit a theory of recovery. I would affirm the judgment in its entirety.

The policy here in question, denominated a "Farmer's Comprehensive Personal Liability Policy," is essentially a homeowner's policy tailored to the special needs and requirements of persons who live in rural areas and engage in those activities of a generally agricultural nature which are normally carried on in such areas. Among the several respects in which this tailoring occurs is in the matter of exclusions from coverage. Thus, while the policy contains the "business pursuits" exclusion found in most if not all homeowner's policies (i.e., excluding coverage of "business pursuits of an insured, except . . . activities therein which are ordinarily incident to nonbusiness pursuits"), the definition of "business" customarily present in such nonfarm policies is modified in the farm policy to reflect the peculiar nexus between home and business which obtains in the case of the typical farm: " 'Business' includes trade, profession, or occupation, *other than farming* and roadside stands maintained principally for the sale of the insured's produce." (Italics added.) The effect of this definition is to render the "business pursuits" exclusion inapplicable (and the insuring agreements applicable) in cases falling within the purview of the italicized language.

The question in this case is whether the special "business pursuits" exclusion in the farmer's policy issued by Fidelity to the insured McGregor is applicable to prevent recovery on that policy by plaintiffs. The trial court, looking to the nature of the activities of the insured out of which the accident arose, found and concluded in essence (1) that the activities in question constituted "business" within the normal meaning of that term, i.e., trade, profession, or occupation; (2) that such activities did not constitute "farming" within the meaning of the specially tailored provision defining "business" for purposes of the "business pursuits" exclusion in the farmer's policy; (3) that the activities therefore constituted "business pursuits" within the meaning of the exclusion; and (4) that the activities were not such that, in spite of their "business" character, they would be withdrawn from the operation of the exclusion as "activities therein which are ordinarily incident to nonbusiness pursuits."[1] On the

---

[1] The relevant findings were the following: "XXI At all relevant times, Richard MacGregor and Barbara MacGregor conducted a multi-faceted business operation at

basis of this determination the trial court held that the "business pursuits" exclusion in the policy was operative to preclude recovery.

The opinion of the majority, as I read it, accepts the first of the trial court's conclusions summarized above and rejects the remaining three. The process of reasoning by which this result is reached is curious enough to warrant reiteration. First the opinion designates the activity of the insured as "the pasturing of horses for a fee" and on the basis of this designation concedes that this activity "would normally be regarded as a business pursuit." Then, turning to the "farming" provision (which if applicable would render the exclusion inapplicable) the majority jettison their initial designation and substitute the more generic "grazing." The new denomination, being clearly preferable for the purposes of the majority because it omits the element of compensation, is then found to be included within "the broad term 'farming.'" Finally, to resolve any possible doubt, recourse is had to the useful principle that all ambiguities are to be resolved against the insurer. Thus it is concluded that the "business pursuits" exclusion does not apply because the activities out of which the accident arose were "farming" within the special exception. Moreover, the majority assure us, those same activities prevented operation of the exclusion on the additional ground that they were activities "ordinarily incident to non-business pursuits." But alas, a new designation for those activities is now needed—suddenly we are concerned not with "the pasturing of horses for a fee," not with "grazing," but with "keeping fences and gates repaired and closed." This latter activity, of course, is "ordinarily incident to normal farming activities," and thus the exclusion is inapplicable on another ground.

---

the Fletcher Hills Ranch, including boarding of horses for profit, riding instruction for profit, training of horses for profit, rental of a riding ring for profit, and the sale of snacks and refreshments for profit at certain riding events.

"XXII The multi-faceted business operation, as described in the foregoing finding, and the particular activities therein enumerated, did not constitute farming within the meaning of the policy issued by the Fidelity & Casualty Company of New York.

"XXIII The accident in question, the death of James Donald Reece, and the claims made against Richard MacGregor in action No. 277640 arose out of, and were directly related to, the non-farming business activities of Richard and Barbara MacGregor as described above.

"XXIV The accident in question, the death of James Reece, and the claims made against Richard MacGregor in action No. 277640 did not arise out of, nor were they related to, any farming operations of Richard MacGregor and Barbara MacGregor nor any non-business pursuits of Richard and Barbara MacGregor.

"XXV The accident in question, the death of James Donald Reece, and the claims made against Richard MacGregor in action No. 277640 did not arise out of, nor were they related to, any activities of Richard or Barbara MacGregor which are ordinarily incident to non-business pursuits within the meaning of the policy issued by Fidelity & Casualty Company of New York."

Comment upon the quality of this reasoning would be superfluous. I am content to suggest that such tortuous ratiocination can only be grounded upon a herculean effort to ignore the clear and amply supported factual findings of the trial court (set forth in fn. 1, *ante*) to the effect that the activities of the insured from which the accident arose had nothing to do with farming in any sense of the word but were part and parcel of his business of operating a riding academy and boarding stable.[2]

But, the majority ask, if the Fidelity policy is not applicable to the insured's activities in this case, what *is* its intended purpose? The insured did not engage in "any other farming activities" and, we are told, "to exclude the entire grazing operation would cut the heart out of the special coverage afforded by this farm-oriented comprehensive policy." Again, the answer is to be found in carefully stated and fully supported findings of the trial court which I set forth *in extenso* in the margin.[3] Those findings, based upon considerable evidence concerning the representations and negotiations which led up to the issuance of the Fidelity policy, were to the effect that that policy *was* issued for the purpose of covering the insured during the frequent occasions when he took his own horses away from the premises to horse shows and like spectacles and *was not* issued to cover the insured's business activities at the ranch. Moreover, the findings indicate that the insured represented to the Fidelity agent that his activities on the ranch were already covered by another policy.[4]

---

[2] We need look no further than the face of the policy itself to determine that the insured's activities were not "farming" as that term is used therein. In the section of the policy titled "Definitions" it is stated that the property of the insured shall not be considered "business property" because of, among other things, the "rental or holding for rental of *not more than three* car spaces or *stalls* in garages or *stables.*" (Italics added.) The implication is clear regarding the operation of a boarding stable of the size here involved wherein, according to the evidence, up to 30 horses were boarded.

[3] "III Richard MacGregor contacted Venberg and Robson on or about February 10, 1962, regarding the placement of certain personal liability insurance coverage.

"IV At all relevant times, defendant Venberg and Robson, through Eric Brelin, was generally cognizant of the nature, extent and scope of activities conducted at the Fletcher Hills Ranch, but reasonably understood that Richard MacGregor was the manager of the ranch and not the tenant of the entire ranch.

"V The defendant Venberg and Robson, through Eric Brelin, was asked to, and did, procure on behalf of Richard MacGregor a policy of insurance to afford personal liability coverage to Richard MacGregor arising out of the ownership and maintenance of MacGregor's own horses while away from the premises.

"VI Venberg and Robson was not asked to obtain insurance to cover any business pursuits of Richard MacGregor on the Fletcher Hills Ranch, but was told that the business pursuits conducted at said ranch were covered by another policy of insurance procured through the owners of the ranch."

[4] The other policy was apparently that written by the Great American Insurance Company, with limits of $10,000/$20,000, which paid $10,000 to plaintiff prior to

It is my view that the trial court properly applied the "business pursuits" exclusion in the Fidelity policy to the facts of this case. Here, as in *Herzog* v. *National American Ins. Co., supra,* 2 Cal.3d 192, and *Huggins* v. *Yoshiwara* (1970) 2 Cal.3d 200 [84 Cal.Rptr. 709, 465 P.2d 845], a plaintiff who has exhausted the limits of insurance issued to cover the kind of accident which in fact occurred seeks to gain further recovery against insurance which was issued with entirely different risks in mind. In those cases we did not allow our sympathies for the plaintiff, who clearly would not be afforded adequate compensation by the applicable policies, to bring about a construction of the policy at issue which was contrary to the intent and reasonable expectations of both the insurer and the insured. We should in this case be equally faithful to our sometimes onerous task.

I would affirm the judgment in its entirety.

Wright, C. J., concurred.

The petition of respondent Fidelity for a rehearing was denied May 3, 1973, and the opinion was modified to read as printed above. Wright, C. J., and Sullivan, J., were of the opinion that the petition should be granted.

the institution of the instant lawsuit. As the majority opinion indicates, the insured also carried an excess policy, which brought the combined limits up to $100,000/$300,000, during the first six months of his lease, but he later allowed that policy to lapse, leaving the Great American policy as the only "business policy" in effect at the time of the accident. It is interesting to note that the combined premiums on the two "business policies" in effect when the insured entered into the Fletcher lease was in the neighborhood of $600 per year; that the premium on the Great American policy alone was approximately $340 per year; and that the premium on the Fidelity policy was $36 per year. Thus the combined "business policies," with a per-person limit of $100,000, had premiums totaling roughly 17 times that of the Fidelity policy, which had the same per-person limit; and the sole "business policy" remaining in force at the time of the accident, the Great American policy, with a per-person limit of $10,000, had a premium almost 10 times that of the Fidelity policy, although its per-person limit was one-tenth the size. Clearly the trial court, in making its findings, took account of the reasonable expectations of the parties to the insurance contract in the context of other available insurance. (Cf. *Herzog* v. *National American Ins. Co.* (1970) 2 Cal.3d 192, 197 [84 Cal.Rptr. 705, 465 P.2d 841].)