[Civ. No. 37523. First Dist., Div. Two. Feb. 9, 1977.]

PRAGER & BEAR, INC., Plaintiff and Appellant, v.
FEDERAL INSURANCE COMPANY, Defendant and Respondent.

## COUNSEL

Farella, Braun & Martel and William R. Friedrich for Plaintiff and Appellant.

Ron W. Fields and James E. Gallagher for Defendant and Respondent.

[Feb. 1977]

## OPINION

**ROUSE, J.**—Plaintiff, Prager & Bear, Inc., appeals from a judgment determining that plaintiff should recover nothing against defendant, Federal Insurance Company, in plaintiff's action for the recovery of inventory losses under a policy of employee fidelity insurance.

Trial was had before the court, sitting without a jury. After the court had rendered its intended decision, plaintiff requested and, at the court's direction, defendant filed, proposed findings of fact and conclusions of law. However, plaintiff later withdrew its request, so we do not have the benefit of the trial court's findings of fact or conclusions of law. ■ Therefore, we must look to the trial court's memorandum of intended decision in order to ascertain the grounds and theory of its decision and to learn the process by which it reached such decision. (*Warren Southwest, Inc.* v. *Wicks* (1969) 276 Cal.App.2d 152, 155 [80 Cal.Rptr. 723].)

Plaintiff is a wholesale distributor of textiles. As a distributor, plaintiff maintained a warehouse in San Francisco where it received textiles from manufacturers in lots of 500 yards, which plaintiff then broke into bolts of 20 yards each. These were stored until they were shipped to various retail outlets.

Plaintiff's business was of a dual nature. Approximately half of the fabrics on hand at a given time were owned by plaintiff's major supplier, Concord, Inc., of New York, which operated as a "converter" of textiles. Concord purchased unfinished textiles from mills and had the goods finished or printed at other plants before selling them to manufacturers or retailers. As Concord's distributing agent, plaintiff stored Concord's goods until they were sold, at which time plaintiff received a sales commission and a warehousing fee. Plaintiff never acquired title to Concord's goods.

At any given time, plaintiff's inventory of Concord's goods was some 300,000 to 500,000 yards. The remainder of plaintiff's inventory consisted of textiles which plaintiff bought and sold on its own behalf.

Plaintiff maintained two systems of inventory control. Records of daily receipts and shipments were kept tabulated on a daily and monthly basis as part of a perpetual inventory. In addition, physical counts of the goods on hand were made each June and December, and the December count

was audited and certified by a national accounting firm. All of plaintiff's records were checked and approved by Concord. Erwin Bear, part owner and secretary-treasurer of plaintiff corporation, testified that the results of the perpetual inventory generally showed a close correlation (within 1 percent) to the actual physical counts.

In June 1970, plaintiff noted a large discrepancy between its perpetual inventory records and the results of its actual count. The perpetual inventory in that month indicated that some 432,000 yards of goods were on hand, whereas the physical count revealed a balance of only some 407,000 yards of material. The difference between the two figures, some 25,000 yards, exceeded by far the expected difference of some 4,000 yards.

Shortly before the physical count of June 1970, plaintiff had discharged its warehouse manager, Neff, because of rumors that employees had been stealing goods. Erwin Bear had noticed a suspicious parcel, containing textiles and addressed to a customer in Hawaii, for which there was no proper documentation, and which later disappeared. When the physical count of June 1970 showed the large disparity noted above, plaintiff's suspicions of employee dishonesty increased, and plaintiff purchased an employee fidelity bond from defendant. Coverage under the bond commenced August 11, 1970.

Plaintiff undertook several security measures in order to prevent or detect break-ins to the premises. They included installation of a burglar alarm system, bars on the windows, and special locks on the warehouse doors. Nevertheless, the inventory in December 1970 revealed a disparity of 15,000 yards between the actual physical count and the perpetual inventory, and the June 1971 inventory showed a further shortage of 28,000 yards.

During the period between October 1970 and June 1971, none of the security devices showed any sign of violation or tampering. Shortly before the June 1971 inventory, the warehouse manager, Goodman, resigned and was replaced by another employee, Lieberman. On the basis of the inventory shortage, plaintiff filed an insurance claim on the fidelity bond, seeking to recover the value of goods and merchandise lost during the period between October 1970 and June 1971. This claim was denied by defendant on the basis of the inventory shortage exclusion clause which is set forth in its policy.

In August 1972, plaintiff discovered more losses and was able to obtain a confession from the new warehouse manager, Lieberman, who admitted that he and another employee, Ramos, had conspired to make fraudulent shipments of plaintiff's textiles between September 1971 and April 1972. The goods in question had been sent to one of plaintiff's customers, the World of Fabrics. World of Fabrics was the same company for which the former warehouse manager, Goodman, went to work after his resignation one week before the June 1971 inventory was taken.

Plaintiff's claim on the employee fidelity bond, for the losses of September 1971 to April 1972, was paid by defendant.

The fidelity bond here in issue is a standard form policy, designed to indemnify an employer for any losses sustained as a result of employee dishonesty. The insuring clause is as follows:

"2. INSURING CLAUSES:

"(a) *Commercial Blanket Employee Dishonesty Coverage* (Insuring Clause I):

"Of money, securities and other property through any fraudulent or dishonest act or acts (including larceny, theft, embezzlement, forgery, misappropriation, wrongful abstraction or willful misapplication) committed by any employees of any Insured included herein, acting alone or in collusion with others."

Coverage under the policy is limited by a number of exclusionary provisions. The provision pertinent to the present case is the inventory shortage exclusion clause, which is as follows:

"3. EXCLUSIONS:

"(a) Insuring Clause I does not cover any loss . . . (4) or that part of any loss as the case may be, the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory computation or enumeration or a comparison of inventory records with an actual physical count of inventory or upon a profit and loss computation; provided, however, that this limitation shall not apply to loss of money, securities or other property which the Insured can prove, through evidence wholly apart from such computation, enumeration or compari-

son, is sustained by the Insured through any fraudulent or dishonest act or acts (including larceny, theft, embezzlement, forgery, misappropriation, wrongful abstraction or willful misapplication) committed by any one or more of the employees."

The present case falls directly within the inventory shortage exclusion clause, since plaintiff's evidence as to the loss in fact and as to the amount of the loss consists almost exclusively of inventory comparisons and computations. Plaintiff acknowledges that the underlying purpose of the clause is to limit the insurer's liability to losses sustained as a result of employee dishonesty only, and to exclude all other sources of loss, such as shoplifting or inaccurate accounting. Plaintiff asserts, however, that, in this instance, the inventory shortage exclusion clause should not apply because the clause is ambiguous and its application would defeat plaintiff's reasonable expectations of coverage; also, because application of the clause does not preclude coverage in light of the independent evidence of employee dishonesty which was produced at the trial.

On the latter point, plaintiff concedes that a certain amount of evidence must be presented in order to allow the trier of fact to infer that the losses claimed by the insured were sustained as a result of employee infidelity.

It appears that the amount of independent evidence required to support an inference of employee dishonesty has never been considered in California. In other jurisdictions, where courts have allowed inventory computations to be introduced to establish loss, the cases vary as to the amount of independent evidence required to raise an inference of employee dishonesty. In *Dunlop Tire & Rubber Corp.* v. *Fidelity & Deposit Co. of Md.* (2d Cir. 1973) 479 F.2d 1243, the court held that an inventory shortage exclusion precluded coverage when there was no independent proof of employee dishonesty and the proof as to loss-in-fact and amount of loss consisted entirely of inventory comparisons.

Prior to 1970, the weight of authority allowed the use of inventory comparisons only for corroboration of independent evidence of employee dishonesty. As a result, coverage was often denied in spite of fairly convincing evidence of employee dishonesty. No evidence of inventory comparisons was allowed to establish the amount of loss even though employees had confessed to dishonesty in *Locke Distributing Co.* v. *Hartford Acc. & Indem. Co.* (Mo.App. 1966) 407 S.W.2d 658. Similarly,

when employees have been caught with stolen goods, the full amount of the loss was not permitted to be established by inventory comparisons in *Danal Jewelry Co.* v. *Fireman's Fund Insurance Co.* (1970) 107 R.I. 33 [264 A.2d 320]. In other instances, it was held that an inference of employee dishonesty could not be drawn solely from the fact that access to the premises was restricted and that only employees could have removed the goods. (*York Lumber Co.* v. *Fidelity & Deposit Co. of Maryland* (E.D.Pa. 1971) 331 F.Supp. 1131; *Kernwood Mfg. Corp.* v. *Home Indemnity Co.* (1970) 65 Misc.2d 354 [317 N.Y.S.2d 113], aff. per curiam (1971) 67 Misc.2d 888 [326 N.Y.S.2d 682].) An inference of possible employee dishonesty was rebutted when the evidence showed that strangers had access to the premises (*Gillette Company* v. *Travelers Indemnity Company* (7th Cir. 1966) 365 F.2d 7) or when the loss could have been attributable to uncertain amounts of waste in processing of missing goods. (*Paramount Paper Products Co.* v. *Aetna Cas. & Sur. Co.* (1968) 182 Neb. 828 [157 N.W.2d 763].)

More recent decisions tend to allow an inference of employee dishonesty to be drawn from relatively thin circumstantial evidence and then to permit the full extent of the losses to be proven by inventory comparisons. Generally, these cases have required some proof of dishonesty by employees as a condition precedent to the admission of inventory comparisons to establish the full amount of loss. In some instances, the amount of loss proven to be a result of dishonesty has been only a small fraction of the total loss claimed.

In *Hoboken Camera Center, Inc.* v. *Hartford Acc. & Ind. Co.* (1967) 93 N.J.Super. 484 [226 A.2d 439, 448], the court held that once the insured had produced some "appreciable" independent proof of a loss caused by employee dishonesty, proof of the amount of the loss could be based entirely upon inventory records. The court further held that inventory records could also be relied upon to corroborate independent proof of an employee-connected loss where such independent proof, standing alone, would be insubstantial.

In *Meyer Jewelry Co.* v. *General Insurance Co. of Amer.* (Mo. 1968) 422 S.W.2d 617, the Missouri Supreme Court held that the inventory shortage exclusion clause did not exclude inventory computations which would tend to prove the amount of the plaintiff's loss where independent evidence first showed that an employee had stolen items from the plaintiff's merchandise inventory.

In *Tri-Motor Sales, Inc.* v. *Travelers Indemnity Co.* (1963) 19 Wis.2d 99 [119 N.W.2d 327], the Wisconsin Supreme Court found the clause here in question sufficiently ambiguous to resolve doubt as to its meaning against the insurer and held that it did not preclude inventory computations to prove the amount of the insured's loss when there was independent evidence of the dishonesty of the employee involved.

In *Mapes Casino, Inc.* v. *Maryland Casualty Company* (D.Nev. 1968) 290 F.Supp. 186, when a claimant produced evidence of theft of casino chips by employees, it was permitted to introduce evidence of house averages to prove the amount of total loss.

In *American Fire and Casualty Company* v. *Burchfield* (1970) 285 Ala. 358 [232 So.2d 606], uncontradicted evidence of theft by four employees and the fact that the full amount of loss could never be proved by independent evidence were sufficient to persuade the Alabama Supreme Court to allow the use of inventory evidence to establish the full amount of loss.

An employee's admitted falsification of inventory figures permitted the claimant to use inventory records to establish the full amount of loss in *Sommer* v. *General Ins. Co. of America* (1970) 22 Ohio App.2d 149 [51 Ohio Ops.2d 294, 259 N.E.2d 142].

In *NIB Foods* v. *Insurance Co. of North America* (1975) 63 Mich.App. 680 [234 N.W.2d 725], the court held that evidence that restaurant bills had not been marked paid, and the manager had taken money from the cash register without leaving a receipt before his unexplained disappearance, constituted evidence of employee dishonesty independent of evidence of inventory computations. Thus, inventory records were admissible to show the amount of loss.

In *Popeo* v. *Liberty Mutual Insurance Company* (1976) — Mass. — [343 N.E.2d 417], the court held that independent proof of employee dishonesty could be indirect in nature and could consist solely of testimony by a purchasing agent and materials control manager to the effect that he had placed specified goods in a locked area accessible only to certain employees and had subsequently found that the goods were missing. Given this evidence, the court held that the dollar amount of the loss could be computed from purchase records.

In the case before us, for purposes of argument we may assume that there was substantial evidence of employee dishonesty prior to October 1970, and during a period after June of 1971. However, we are not here concerned with such losses, since there was no fidelity bond when the first losses occurred and because plaintiff was paid by defendant for the losses which occurred during the later period. We are concerned solely with the losses which occurred between October 1970 and June 1971 and whether, as to these losses, there was any independent evidence of employee dishonesty or evidence tending to connect such losses with the prior or subsequent losses. The trial court found that there was not,[1] and we have concluded that its finding must be upheld.

Mr. Bear, an officer and coowner of plaintiff corporation, admitted during his testimony that he was aware of no facts which indicated employee dishonesty during the period between October 1970 and June 1971. Neither was there any evidence tending to connect the losses which occurred during this period of time with those which had occurred previously or with those which occurred thereafter. In fact, the evidence was to the contrary. In June 1970, following the initial losses, plaintiff discharged its warehouse manager, Mr. Neff. There was also evidence that during a strike which occurred in August 1970, a number of plaintiff's employees ceased work and never returned to their jobs. This evidence suggests the possibility that the individual or individuals responsible for the initial losses were no longer in plaintiff's employ after the summer of 1970, and therefore could not have been responsible for the losses which occurred during the period between October 1970 and June 1971. As for the losses which occurred thereafter, plaintiff was able to obtain a confession from Mr. Lieberman, who had served as plaintiff's warehouse manager since June 1971 and who had been in plaintiff's employ since the summer of 1970. Lieberman stated that his wrongful activities had commenced only after he had been contacted in October 1971 on behalf of a company called the World of Fabrics and encouraged to engage in thievery. Mr. Bear's investigation into the matter confirmed Lieberman's statements as to the approximate date when he began to steal. Mr. Bear testified that, although he found a great number of unauthorized bills of lading made out to the World of Fabrics

---

[1] In its intended decision, the court stated that the exclusionary clause contained in the fidelity bond "requires that the evidence of employee dishonesty be furnished by plaintiff with respect to the alleged loss before inventory computation can be admitted to prove the factual existence of the loss and the amount of the loss. Plaintiff failed in its burden of proof to establish employee dishonesty for the October, 1970—June, 1971 period, and the amount of said inventory loss, if any."

and signed by Lieberman, the earliest of these was dated September 1971. Mr. Bear also admitted that, although the losses which occurred between October 1970 and June 1971 involved Concord goods, none of the thefts committed by Lieberman involved such goods. Bear testified that he possessed no information or facts which suggested that Lieberman was involved in the losses which occurred between October 1970 and June 1971.

█ While it is the policy of the California courts to construe insurance clauses liberally in favor of the insured and strictly against the insurer (*Wint* v. *Fidelity & Casualty Co.* (1973) 9 Cal.3d 257 [107 Cal.Rptr. 175, 507 P.2d 1383]; *Crane* v. *State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112 [95 Cal.Rptr. 513, 485 P.2d 1129, 48 A.L.R.3d 1089]; *Paramount Properties Co.* v. *Transamerica Title Ins. Co.* (1970) 1 Cal.3d 562 [83 Cal.Rptr. 394, 463 P.2d 746]), we find that, upon this state of the record, the trial court must be upheld in its determination that there was no evidence from which a trier of fact could reasonably conclude that the losses which are the subject of this action resulted from employee dishonesty. █ Thus, we hold that plaintiff was not entitled to prove the fact or amount of such losses by inventory computations.

Plaintiff also contends that the inventory shortage exclusion clause is ambiguous and uncertain as to whether it was intended to apply to the particular type of dual system of inventory accounting maintained on the Concord goods. In its intended decision, the trial court concluded that the inventory shortage exclusion is "definite, unambiguous and therefore binding on the parties."

For reasons previously discussed, the resolution of the ambiguity issue is not essential to our determination of this matter on appeal. No matter how construed, it is clear that under the requirements of that clause there must be *some* evidence that the losses for which coverage is sought were caused by employee dishonesty before the court can consider any evidence of the method by which the extent of such losses has been determined. Here, plaintiff presented evidence that its perpetual unit-type inventory was audited annually and records were compared favorably with the records of Concord, Inc., the owner of the goods. Notwithstanding the reliability of such inventory computation methods, however, the trial court found that such evidence failed to prove that the losses which it disclosed were necessarily caused by any act or acts of

employee dishonesty. As has been pointed out, our examination of the record shows that the trial court was correct in its conclusion.

Judgment affirmed.

Taylor, P. J., and Kane, J., concurred.

A petition for a rehearing was denied March 11, 1977, and appellant's petition for a hearing by the Supreme Court was denied April 7, 1977. Bird, C. J., Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.