Filed 9/10/15

**CERTIFIED FOR PUBLICATION**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

21ST CENTURY INSURANCE
COMPANY,

     Petitioner,

v.

THE SUPERIOR COURT OF
SAN BERNARDINO COUNTY,

     Respondent;

CY TAPIA et al.,

     Real Parties in Interest.

E062244

(Super.Ct.No. CIVDS1014138)

OPINION

ORIGINAL PROCEEDINGS; petition for writ of mandate/prohibition. Brian S. McCarville, Judge. Petition is granted.

Hollins Law, Andrew S. Hollins, Brieanna M. Dolmage; Greines, Martin, Stein & Richland, Robert A. Olson and Feris M. Greenberger, for Petitioner.

1

Sedgwick, Hilary Rowen and Michael Topp as amicus curiae on behalf of Petitioner.

No appearance for Respondent.

Robinson Calcagnie Robinson Shapiro Davis and William D. Shapiro, for Real Parties in Interest.

In this matter we find that plaintiff's efforts to pursue essentially a "bad faith" action as assignee of the insured must fail. Accordingly, petitioner, the insurer in question, is entitled to the summary judgment sought below.

## STATEMENT OF FACTS

The underlying litigation is one for personal injury and wrongful death. Defendant Cy Tapia, a teenager living with his aunt and grandmother, was driving a vehicle which crashed, inflicting severe and eventually fatal injuries on his passenger, Cory Driscoll.

Before his death Driscoll and his mother filed an action for damages on March 6, 2007. The parties soon established that the vehicle driven by Tapia was owned by his grandfather and that Tapia was entitled to $100,000 in liability coverage under an auto policy issued to Melissa McGuire (Tapia's sister), which listed the vehicle as an insured vehicle *and* listed Tapia as *the* driver of the vehicle. This policy was issued by petitioner and defendant in this action, 21st Century Insurance Company (21st Century). In October 2007, 21st Century offered to settle the action for the policy limits of the McGuire policy—that is, $100,000.

2

However, plaintiff[1] also believed that Tapia might be covered under policies issued to his aunt and grandmother, each offering $25,000 in coverage and also issued by 21st Century. Accordingly, plaintiff communicated an offer to settle for $150,000 to Tapia's counsel in July of 2008.[2] 21st Century contends that it never received this offer—that is, that Tapia's counsel did not inform it of the offer—although there was certainly evidence to the contrary. In any event, the offer was not accepted within the time provided.

Shortly thereafter (and inferrably having realized the seriousness of its position), in early September 2008, 21st Century affirmatively offered the "full" $150,000 to settle the case against Tapia. Plaintiff did not accept this offer, but a month later plaintiff's counsel served a statutory offer to compromise pursuant to Code of Civil Procedure section 998. This offer sought $3,000,000 for Cory Driscoll and $1,150,000 for his mother Jenny Driscoll. Shortly before the expiration of this offer, 21st Century sent Tapia a letter warning him that it would not agree to be bound if Tapia personally elected to accept the offer.

Nonetheless, Tapia, in January of 2009, agreed to the entry of a stipulated judgment in the amounts demanded by plaintiff. 21st Century paid $150,000 plus interest

---

[1] We will employ the term "plaintiff" to refer both to Cory Driscoll and his mother in the underlying litigation, and to the "Estate of Cory Allen Driscoll" prosecuting this action.

[2] The parties disputed whether this offer was intended to include the claims of Cory Driscoll's mother. The point is not significant to our decision.

3

to the plaintiff—the amount represented by all three policies. Tapia then assigned any rights he had against 21st Century to plaintiff. This assignment and agreement included plaintiff's promise not to execute on the judgment against Tapia so long as he complied with his obligations, e.g., to testify to certain facts concerning the original litigation and 21st Century's actions.[3] This bad faith action followed.

21st Century moved for summary judgment on two primary related grounds: first, that Tapia's settlement without its consent vitiated any claim in excess of policy limits, and second, that there was no coverage beyond $100,000 and thus no obligation to offer more in settlement.[4]

## DISCUSSION

The first position was based upon *Hamilton v. Maryland Casualty Co.* (2002) 27 Cal.4th 718 (*Hamilton*), in which the insured, as here, agreed to a stipulated judgment without the consent of the insurer, who was providing a defense. The court in *Hamilton* acknowledged and restated several rules. It noted that an insurer may have a duty to

---

[3] A copy of the assignment and agreement appears in *plaintiff*'s documentation filed below, although we have not found it in 21st Century's. Similarly, although 21st Century set out 124 "undisputed material facts" in its "separate statement," none of them relates to the actual contents of the agreement although in the *motion* it is argued that there was a covenant not to execute.

[4] Plaintiff argues that because 21st Century eventually *did* pay out under all three policies, it thereby either conceded coverage or waived any right to contest coverage. We disagree. In a case of potential seven-figure liability, an insurer's attempt to fend off any "bad faith" claim by voluntarily paying under all policies which are claimed to apply—even if meritlessly—cannot operate as a concession of coverage. To do so would place the insurer in a "Catch-22" situation—it is liable for bad faith if it refuses to pay under disputed policies, yet concedes coverage if it does pay.

4

accept reasonable settlement offers within policy limits if there is a legitimate risk of a substantially higher judgment. (*Hamilton*, at pp. 724-725, citing *Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658-661.) The court also explained that when the insurer refuses to accept such a reasonable settlement offer, it may become liable to its insured for the amount of any judgment in excess of policy limits. (*Hamilton*, at p. 725; *Archdale v. American Internat. Specialty Lines Ins. Co.* (2007) 154 Cal.App.4th 449, 463.)

However, *Hamilton* holds that when the insured goes behind the insurer's back, so to speak, and enters into a stipulated judgment, "a defending insurer cannot be bound by a settlement made without its participation and without any actual commitment on its insured's part to pay the judgment." (*Hamilton, supra*, 27 Cal.4th at p. 730.) In such a case, even if the insurer's refusal to settle is unreasonable, "the agreed judgment cannot fairly be attributed to the insurer's conduct . . . ." (*Id*. at p. 731.)[5]

---

[5] At oral argument, counsel for plaintiff took the position that *Hamilton* did not apply because 21st Century *did* agree to the stipulated judgment. The basis for the position was that 21st Century hired the attorney who represented Cy Tapia and that "therefore" the attorney's approval of the settlement is imputed to 21st Century. But even if we accept arguendo that the attorney had dual obligations, it is plain that petitioner never authorized him to accept the settlement offer, and in fact clearly communicated that it did not agree. An agent's authority is limited by his agreement with the principal and the principal is not bound by an act outside that authority. (*van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 572-573.) The assertion that counsel personally consented to the judgment is inaccurate; the letter accepting plaintiff's offers to compromise clearly indicated that "our client, defendant Cy Tapia" accepted the offers; the subsequent assignment of rights and covenant not to execute was signed *only* by Tapia. The fact that counsel recognized that Tapia's interests would be served by accepting the offer and therefore may have recommended acceptance as a matter of

*[footnote continued on next page]*

*Hamilton* simply held that the stipulated judgment "carries no weight in the bad faith action" brought by the assignee, and "moreover, plaintiffs cannot show [the assignor/defendant] suffered any damages as a result of Maryland's alleged breach." (*Hamilton, supra*, 27 Cal.4th at p. 731.)

Despite the language concerning the insured's not having suffered any damages, it appears that the crucial element is the lack of a judgment rendered after an adversarial trial. The potential for collusion in the circumstances involved is obvious. (See *Safeco Ins. Co. v. Superior Court* (1999) 71 Cal.App.4th 782, 787 (*Safeco*).) But we note that *Hamilton* is not unsympathetic to the plight of an insured exposed to the risk of a judgment vastly in excess of policy limits. Agreeing with statements in *Safeco*, *Hamilton* indicates that the insured may assign any bad faith claims to the plaintiff in exchange for a covenant not to execute; the assignment will become operative *after trial* and in the event that an excess judgment has been rendered. (*Hamilton, supra*, 27 Cal.4th at p. 732, quoting *Safeco,* at pp. 788-789.) The vice in *Hamilton*, as here, was that the insured *stipulated* to a judgment which the claimant, plaintiffs in this action, relied upon to prove damage.

On its face *Hamilton* places plaintiff in an awkward position. However, *Hamilton* applies only where an insurer has accepted coverage and is carrying out its duty to defend. (*Hamilton, supra*, 27 Cal.4th at p. 728; see *Sanchez v. Truck Ins. Exchange*

---

*[footnote continued from previous page]*
fulfilling his obligations to Tapia does not mean that 21st Century was automatically bound.

6

(1994) 21 Cal.App.4th 1778, 1784.) If an insurer *refuses* to defend, the insured is free to enter into a non-collusive settlement and then maintain *or* assign an action against the insurer for breach of the duty to defend. In the subsequent action the amount of the settlement *will* be presumptive evidence of the amount of the insured's liability. (*Hamilton,* at pp. 728-729.)

Plaintiff here accordingly focused on the position that 21st Century breached its duty to defend and that Tapia was therefore free to make whatever settlement he wished. To the extent that plaintiff argues that 21st Century committed various errors and omissions in the defense, the argument is meritless. Neither the adequacy of the representation nor the effectiveness of the defense are relevant to the question of whether the insured can enter into a binding settlement without the insurer's consent.[6] (*Safeco*, *supra*, 71 Cal.App.4th at p. 789.)

Plaintiff's most salient point is that 21st Century did not acknowledge coverage or a duty to defend as to either of the $25,000 policies it issued to Tapia's aunt and grandmother. Accordingly, plaintiff argues that because 21st Century failed to defend Tapia under *those* policies, Tapia could enter into a stipulated judgment with plaintiff that would bind the insurer.

---

[6] *Hamilton* was also a breach of duty case—obviously, the assignment of rights *only* comes into play where either the insured or the claimant believes that the insurer has failed to comply with its express or implied duties and that the insured is thereby aggrieved. Put another way, if the insurer behaves with perfect rectitude, an assignment of the insured's rights would be valueless. Simply alleging the details of said alleged errors in hyperbolic and accusatory terms does not avoid the rule of *Hamilton*.

Plaintiff's position is supported by *Risely v. Interinsurance Exchange of the Auto Club* (2010) 183 Cal.App.4th 196 (*Risely*), which allowed the claimant—the original plaintiff and assignee of the insured's claim against the insurer—to rely on a stipulated judgment. The insured had two policies with the insurer—one for automobile insurance with a $50,000 policy limit, the other for homeowner's insurance offering $300,000 in coverage. (*Risely*, at p. 202.) The insurer denied coverage under the homeowner's policy but defended under the automobile policy. The appellate court reversed summary judgment in favor of the insurer (which relied on *Hamilton*), first finding that a defense under one policy did not immunize the failure to defend under a second policy. (*Risely*, at p. 215.) It then held that the insurer had not established "as a matter of law" that its insured could not have been damaged by its refusal to defend under the homeowner's policy. The theory was that the insurer had not shown that the claimant would not have accepted a "policy limits" offer on *both* policies, which would have avoided the risk of an excess judgment. (*Id*. at p. 217.)

*Risely* followed *Wint v. Fidelity & Casualty Co.* (1973) 9 Cal.3d 257 (*Wint*), a case arising out of a wrongful death action which involved three potentially applicable policies offering respectively $10,000, $100,000, and an unspecified amount of coverage. Only the issuer of the $10,000 policy agreed to defend. The insured eventually settled the action for $80,000, with the issuer of the $10,000 policy paying policy limits. The insured then assigned his rights against the issuer of the $100,000 policy, Fidelity. (*Id*. at pp. 260-261.)

8

In the action against Fidelity,[7] based upon the theory that its failure to defend justified the insured's settlement, the insurer argued that even if there was coverage, there was no harm to the insured because he was provided a defense by the other insurer. This argument was flatly rejected, the court stating "a defense by an insurer whose policy has a limit far below the amount claimed cannot be equated to the defense of an insurer who stands to lose 10 times as much as the insurer who defends . . . where more than one insurer owes a duty to defend, a defense by one constitutes no excuse of the failure of any other insurer to perform." (*Wint*, *supra*, 9 Cal.3d at p. 263, citing *Continental Cas. Co. v. Zurich Ins. Co.* (1961) 57 Cal.2d 27, 37.)[8]

We find *Risely* and *Wint* distinguishable.

In this case not only did petitioner defend under the policy with the highest coverage, the total available had it accepted the defense under all three policies was not significantly higher. There is no reason to suppose that the defense offered under a $100,000 policy would be significantly less effective than that under $150,000 of coverage. Thus, the situation is quite different from either *Risely* ($50,000 vs. $300,000 and a total of $350,000 both available as defense costs and at risk from the same insurer)

---

[7] The court held that the third policy did not provide coverage and that the assigned cause of action against that insurer could not be sustained. (*Wint*, *supra*, 9 Cal.3d at pp. 264-265.)

[8] In *Wint*, the Supreme Court found that the Fidelity policy *did* cover the incident in question although it also refers to a "potential [for] liability" as triggering the duty to defend. (9 Cal.3d at pp. 262-263.) But if the decision is not entirely clear on the issue, it *is* clear that the insurer never established that its policy did *not* cover the incident.

or *Wint* (a $10,000 policy as against a $100,000 policy, totaling $110,000). That is, even if 21st Century had a duty to defend under all policies, its partial breach of that duty cannot have affected the defense offered.[9]

However, we need not rely exclusively upon distinguishing *Wint* and *Risely*.[10] The critical factor in this case is that 21st Century simply did not have a duty to defend Tapia under either of the policies and that this is beyond dispute and was beyond dispute at the time plaintiff's offer to settle for $150,000 was not accepted.

As we have noted, the policy issued to Melissa McGuire specifically listed the vehicle being driven by Tapia at the time of the accident as an insured vehicle. The policy expressly listed Tapia as a "rated driver" of that vehicle. On the other hand, neither the truck nor Tapia were listed on the policies issued to Tapia's grandmother, Norma Velasquez, and aunt, Donna Leith.

---

[9] It is true that plaintiff did offer to settle the case for the total of all three policies—$150,000—and that this was not accepted within the time frame of the offer. However, very shortly thereafter, 21st Century *did* offer the $150,000 that had been demanded. Hence, even if it maintained at that time that there was no coverage under the two smaller policies, this position did not affect its offer. The fact that plaintiff was no longer willing to accept $150,000—the same amount demanded less than two months before—obviously had nothing to do with the evaluation of plaintiff's case and everything to do with the potential for a bad faith failure to settle the lawsuit. Where in the end 21st Century's failure to timely accept the $150,000 offer harmed only itself (by leading to this lawsuit), it cannot be said that the failure—which it promptly tried to address—injuriously breached a duty owned to Tapia.

[10] At oral argument, counsel for petitioner urged us to formally disagree with the result in *Risely*. As such a conclusion is unnecessary to the disposition of the case, we decline to do so.

10

Both of these policies offered coverage as "insured automobile[s]" for vehicles "not owned by you while temporarily used . . . as a substitute for any automobile . . . insured under this part which is owned by you when withdrawn from normal use for servicing or repairs . . . ." "Insured automobile" also includes under the policies newly acquired vehicles provided the insured promptly notifies the insurer. Finally, both policies include as "additional insured automobile[s]" any vehicle "not owned nor available for regular use by you, a relative or a resident of the same household in which you reside, used with the permission of the owner."

There has never been any contention that the truck involved in the accident was used by either Velasquez or Leith as a substitute vehicle and nothing in the record suggests that 21st Century should have considered such a possibility. This is especially true as the vehicle was being driven by Tapia, who was not listed on either policy and whose coverage was claimed under the McGuire policy listing a different address.

Any potential coverage therefore depends on whether the truck being driven by Tapia at the time of the accident was "available for [his] regular use." If it was, it was excluded under the plain language of the policies. It is clear that even if 21st Century was affirmatively refusing to defend Tapia under the Leith and Velasquez policies in the summer of 2008, it was justified in doing so.

We recognize that the duty to defend is broader than the duty to indemnify and extends to cases which offer a mere potential for coverage. (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 287.) However, even where an insurer

11

initially accepts a defense[11] it may withdraw once it is factually beyond dispute that no potential for coverage exists, and a prior judicial determination in that situation is not necessary. (*Ringler Associates, Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1191-1192.)

In this case, Tapia testified in February 2008 that his grandfather had offered him the use of the vehicle. (He "asked me if I wanted it" in 2002.) "Then I just waited until I got my license, and then I started driving it." Thus, at that point it was clear that Tapia had the "regular use" of the truck and it was therefore *not* an insured vehicle.[12]

The trial court felt that because there was evidence that Tapia's aunt and grandmother also sometimes drove the vehicle, as well as evidence that all three sometimes drove all three vehicles, the exclusion did not apply. But the policy does not exclude only vehicles "exclusively" used by a resident or relative; it excludes vehicles "available for regular use" by that person. Tapia regularly drove the truck which was involved in the accident and this was established long before plaintiff offered to settle the case for $150,000.[13] At that point clearly 21st Century had no obligation to defend Tapia

---

[11] It does not appear that 21st Century did so with respect to the two disputed policies.

[12] 21st Century plausibly explains that the point of this exclusion is to prevent insureds or members of their household from obtaining coverage for additional vehicles not disclosed on the application or listed on the policy, but regularly available for their use.

[13] Arguably there would have been coverage if he had been driving one of the listed vehicles owned by Leith or Velasquez, but of course that isn't what happened.

12

under the aunt's and grandmother's policies, and was discharging its obligations by defending him solely under the McGuire policy.

Plaintiff's fallback position is that even if 21st Century had no duty to defend Tapia under the two smaller policies, it nevertheless breached its obligations to Tapia by not informing him of the $150,000 offer to settle so that Tapia could have attempted to come up with the additional $50,000 on his own. Assuming arguendo both that petitioner breached its duties and that there was any possibility that Tapia could have raised the additional $50,000,[14] this does not aid plaintiff. As we have explained, if Tapia was the victim of insurer misconduct, he had the option of assigning his rights against 21st Century *after trial and judgment.* And at trial, we point out, both Tapia's liability and plaintiff's damages would have been established after active litigation. Instead, for reasons unclear, Tapia and plaintiff elected to settle *without* a trial and judgment after verdict. While they were free to do so, *Hamilton* bars the use of the stipulated judgment to prove Tapia's damages. (See fn. 6, *ante*.)

## DISPOSITION

Accordingly, the petition for writ of mandate/prohibition is granted. Let a peremptory writ of mandate/prohibition issue, directing the Superior Court of San Bernardino County to vacate its order denying petitioner's motion for summary judgment, and to enter a new order granting said motion.

---

**14** Realistically, it would seem more sensible for Tapia simply to have suffered an uncollectible judgment and paid nothing more, perhaps declaring bankruptcy, rather than to take on $50,000 in debt or family obligation.

13

Petitioner is directed to prepare and have the peremptory writ of mandate/prohibition issued, copies served, and the original filed with the clerk of this court, together with proof of service on all parties. Petitioner to recover its costs.

The previously ordered stay is lifted.

CERTIFIED FOR PUBLICATION

McKINSTER<br>J.

We concur:


HOLLENHORST
            Acting P. J.


CODRINGTON
            J.

14