THE AETNA CASUALTY AND SURETY COMPANY
ET AL. *v.* THE BRETHREN MUTUAL
INSURANCE COMPANY ET AL.

[No. 218, September Term, 1977.]

*Decided December 8, 1977.*

The cause was argued before GILBERT, C. J., and MASON and LISS, JJ.

*Benjamin R. Goertemiller* and *E. Charles Dann, Jr.*, with whom were *John S. Landbeck* and *Semmes, Bowen & Semmes* on the brief, for appellants.

*William H. Hicks*, with whom were *George M. Radcliff* and *Niles, Barton & Wilmer* on the brief, for appellees.

Liss, J., delivered the opinion of the Court.

The Aetna Casualty and Surety Company (Aetna) and its insured, J. William Boniface (Boniface), appellants, filed a declaratory judgment action in the Circuit Court for Baltimore County, seeking a declaration that an insurance policy issued to Boniface by The Brethren Mutual Insurance Company (Brethren), appellee, provided him with coverage for certain claims made against him by one Henry L. Barnett (Barnett). They also sought a declaration: 1) that Brethren is responsible for certain attorneys' fees and other costs incurred by Aetna in defending Boniface against the claims being made against him by Barnett, and 2) that Brethren must pay the attorneys' fees and other costs incurred by Boniface and Aetna in pursuing the declaratory judgment action. On February 14, 1977, a hearing on the merits of the declaratory judgment action was held before Judge Marvin J. Land, who denied all of the requested declarations. This appeal was taken from that decision.

The facts are not disputed, and the parties have set forth in the joint record extract filed in this appeal an agreed statement of facts which we will accept as the factual basis for this controversy. That statement, with minor amendments, we repeat here verbatim:

> "J. William Boniface and William Boniface, as partners, owned and operated a farm in Harford County, Maryland, known as Bonita Farm, which consisted of a total of one hundred acres with approximately eighty acres being devoted to the breeding and raising of young, thoroughbred race horses — including the pasturing of these horses, and the remainder being comprised of the private

residences of J. William Boniface and William Boniface; barns for the purpose of stabling horses; ... an indoor training track; an outdoor training race track; and a small amount of unused woodland. J. William Boniface and William Boniface owned brood mares which they kept at Bonita Farm for breeding, and depending on the quality of the foals produced, they would either sell them or train them for racing. They also entered horses into races at tracks away from Bonita Farm. In addition, at Bonita Farm they bred, raised, and trained thoroughbred race horses owned by others.

"On September 15, 1972, Boniface purchased for $1,300 a brood mare known as Sasal, which until December 8, 1973 was kept at Bonita Farm solely for breeding purposes; ... she was never raced, nor was she ever in training for racing. Although she was bred in the Spring of 1973 she was barren and was, therefore, kept in a field away from the mares in foal. At some time late in the night of December 7, or early in the morning of December 8, 1973, Sasal escaped from the field on Bonita Farm in which she had been pasturing, and on December 8, 1973, she was involved in a collision on Creswell Road in Harford County with an automobile being driven by Barnett. As a result of the injuries Mr. Barnett sustained in the collision, he brought suit against Boniface [which has been stayed pending the outcome of this case], alleging that Sasal was running loose on Creswell Road due to the negligence of Boniface in that she had escaped through an open gate in the fence surrounding the field where she had been pasturing.

"On December 7 & 8, 1973, Aetna had in full force and effect a policy of insurance titled, 'Manufacturers' and Contractors' Liability Policy' (No. 98PS71499), under which Boniface, *inter alia*, was a named insured and which obligated Aetna to

provide Boniface with a defense to the law suit brought against him by Barnett and to pay to the limits of the policy, $100,000, any monies which Boniface is found to be legally obligated to pay Barnett as a result of the collision involving Sasal. In addition, the Aetna policy contained the following provision:

> *Other Insurance.* The insurance afforded by this policy is primary insurance except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the company's liability under this policy shall not be reduced by the existence of such other insurance.
>
> When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:
>
> (a) *Contribution by Equal Shares.* If all of such other valid and collectible insurance provides for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limits of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer

has paid its limit in full or the full amount of the loss is paid.

(b) *Contribution by Limits.* If any of such other insurance does not provide for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

"In addition, on December 7 & 8, 1973, Boniface was a named insured under a policy of insurance (No. 51648) issued by Brethren, which provided fire and extended coverage and which included a 'Farmers' Comprehensive Personal Liability Endorsement'. Under the terms of this endorsement which also contained $100,000 limits, Brethren was obligated to:

I. COVERAGE L — PERSONAL LIABILITY

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

"The policy also contained an exclusion which provided that coverage does not apply:

(b) to bodily injury or property damage arising out of

(1) business pursuits of any insured except

(i) activities therein which are ordinarily incident to non-business pursuits and

(ii) *farming*, or

(2) the rendering of or failing to render professional services.

"It also defined farming to include, 'the operation of roadside stands maintained principally for the sale of the insured's farm products.' In addition, the policy contained the following provision:

*Other insurance.* The insurance afforded by this endorsement is primary insurance except that with respect to loss arising out of the ownership, maintenance, operation, use, loading or unloading of 1) any automobile or midget automobile at the insured premises, or 2) watercraft, or any land public conveyance, this insurance shall be excess insurance over any other valid and collectible insurance available to the insured.

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

(a) *Contribution by Equal Shares.* If all of such other valid and collectible insurance provides for contribution by equal shares,

the company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

(b) *Contribution by Limits.* If any of such other insurance does not provide for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this endorsement for such loss bears to the total applicable limit of liability by all valid and collectible insurance against such loss.

"Pursuant to the terms of their respective policies, Aetna and Brethren retained separate counsel to represent Boniface in the suit filed against him by Barnett and Boniface also retained personal counsel to represent him. In May of 1975, the counsel retained by Brethren withdrew his appearance on behalf of Boniface; and since that date, counsel retained by Aetna, along with personal counsel for Boniface, has represented Boniface in the Barnett suit. In addition, Brethren advised all concerned that it was denying coverage to Boniface for any damages he may be found liable to pay to Barnett.

"As a consequence of the denial of coverage by Brethren, Boniface and Aetna brought a declaratory judgment action in the Circuit Court

for Baltimore County in which they requested a declaration: that the policy issued by Brethren is applicable to the claims being made by Barnett against Boniface; that under the applicable terms of the Aetna and the Brethren policies Brethren is obligated to pay, up to $100,000, one half of any monies which Boniface is found liable to pay to Barnett; that Brethren is obligated to pay one half of the legal fees and costs incurred in defending Boniface in the suit brought against him by Barnett; and that Brethren is obligated to pay the legal fees and costs incurred in pursuing the declaratory judgment action. At a hearing on the merits on February 14, 1977, the requested declarations were denied, [and it is from these judgments that Aetna and Boniface have filed this appeal]." (Footnotes omitted; emphasis in original).

(1)

The agreed statement of facts in this case establishes that on the date of the accident which forms the subject matter of this appeal, Boniface was the named insured under the broad coverage of the insurance policy issued by Brethren which provided fire and extended coverage and included a farmers' comprehensive personal liability endorsement. Under the terms of the endorsement, with policy limits of $100,000, Brethren was obligated to pay all damages which the insured might become legally obligated to pay because of bodily injury or property damage and to defend any suit which might arise out of any occurrence covered by the endorsement. The policy contained an exclusion which provided that coverage did not extend to bodily injury or property damage arising out of the business pursuits of the insured but did provide coverage for such activities which were ordinarily incident to non-business pursuits and farming; farming was so defined as to include "the operation of roadside stands maintained principally for the sale of the insured's farm products."

It is conceded that Aetna, by reason of the policy issued to its insured, Boniface, was required to furnish indemnity in the amount of $100,000 and to furnish a defense to any suit filed against him within the coverage of the policy. Aetna and Boniface jointly contend, however, that Brethren was required to supplement Aetna's coverage and defense up to an additional amount of $100,000 because the incident arose out of Boniface's activities in "farming" rather than out of business pursuits.

Brethren in its policy did not undertake to define the word "farming". It seems clear to us that the language used in the exclusionary clause admits of more than one meaning and is equivocal at best. This requires us to apply the test recited in *C & H Plumbing and Heating, Inc. v. Employers Mutual Casualty Co.*, 264 Md. 510, 287 A. 2d 238 (1972), to determine whether there is an ambiguity in the policy. Quoting from 1 *Couch on Insurance 2d* (1959) at 824, the Court stated the applicable test as: "not what the insurer intended its words to mean, but what a reasonably prudent person applying for insurance would have understood them to mean. The criterion is ambiguity from the standpoint of a layman, not from that of a lawyer." 264 Md. at 515.

We have no difficulty in concluding that the failure of the policy to define the word "farming" creates an ambiguity so far as the exclusionary clause is concerned. Once having reached this conclusion, we must apply those rules of interpretation of an insurance contract which were most recently stated by Chief Judge Murphy in *Aragona v. St. Paul Fire and Marine Insurance Co.*, 281 Md. 371, 378 A. 2d 1346 (1977):

> "Insurance contracts, like other contracts, must be read as a single document and construed as a whole to ascertain what the parties really meant. *Federal Ins. Co. v. Allstate Ins. Co.*, 275 Md. 460, 341 A. 2d 399 (1975); *Automobile Ins. Co. v. Thomas*, 153 Md. 253, 138 A. 33 (1927). In other words, the primary purpose in construing insurance contracts is to ascertain and effectuate

the intention of the parties, *U.S.F. & G. v. Nat. Pav. Co.*, 228 Md. 40, 178 A. 2d 872 (1962); *Life Insurance Co. v. Plummer*, 181 Md. 140, 28 A. 2d 856 (1942), and the language employed in the policy is to be afforded its ordinary and usually accepted meaning. *C & H Plumbing v. Employers Mut.*, 264 Md. 510, 287 A. 2d 238 (1972); *State Farm Mutual v. Treas*, 254 Md. 615, 255 A. 2d 296 (1969). When the language is unambiguous and plain as to its meaning, construction of the insurance contract is within the province of the courts, and Maryland has not adopted the rule, followed in many jurisdictions, that an insurance policy is to be most strongly construed against the insurer. *Travelers Ins. Co. v. Benton*, 278 Md. 542, 365 A. 2d 1000 (1976); *Gov't Employees Insur. v. DeJames*, 256 Md. 717, 261 A. 2d 747 (1970). Where, however, the language of an insurance contract is ambiguous, construction is for the jury and the ambiguity is to be resolved against the company which prepared the policy and in favor of the insured. *American Cas. Co. v. Aetna Cas.*, 251 Md. 677, 248 A. 2d 487 (1968); *Gov't Employees Insur. v. DeJames, supra.*" Slip Opinion at 4-5.

In a declaratory judgment proceeding, the trial court may sit not only to determine issues of law but as the trier of the facts, and its conclusions as to the facts will not be disturbed unless found to be clearly erroneous. Rule 1086. The declaratory proceeding is appropriate for the purpose of construing an insurance policy and determining the rights and obligations of insurer and insured under its provisions. *World Insurance Co. v. Perry*, 210 Md. 449, 124 A. 2d 259 (1956); *Commercial Casualty Insurance Co. v. Webb*, 210 Md. 8, 121 A. 2d 832 (1956). The appellants here chose to institute the declaratory proceeding in such a manner that the court, rather than a jury, was required to resolve the factual dispute as to what the intended coverage of the Brethren policy was. It therefore becomes our task to examine the factual conclusions

of the trial court and determine whether or not they were clearly erroneous.

Daniel Webster, the great orator, once said, "When tillage begins, other arts follow. The farmers, therefore, are the founders of human civilization." [1] Be that as it may, it does not help us in determining when a farmer is engaged in farming. The very definitions of the controlling words in the Brethren policy disclose nuances which are surprising to the casual reader.[2] A careful examination of a number of dictionaries convinces us that the following definitions are those applicable to the factual posture of this case:

Farm — "a tract of land usually with a house or barn, etc. on which crops and often livestock are raised for livelihood; land or water devoted to the raising of animals or fish, e.g., pig-farm, oyster-farm"; [3]

Farmer — "one who follows the occupation of a farmer"; [4]

Farming — "the business of cultivating land, raising stock, — agriculture husbandry." [5]

Appellants contend that Boniface's operation of Bonita Farm was "farming" within the ordinary meaning of the word. It is conceded that Boniface did not harvest crops, till the soil, or raise any livestock other than horses. Appellants suggest, however, that the keeping and breeding of brood mares and the pasturing, training, buying and selling of

---

1. Speech "On Agriculture" (January 13, 1840).

2. The Compact Edition of the Oxford English Dictionary (1971) gives as its first definition of "farm," — "A fixed yearly amount whether in money or kind — payable as tax, rent or the like (as opposed to a rent, tax, etc. of variable amount, e.g., one calculated at a certain proportion of the produce)". We note that it seems clear that the original meaning of the word "farm" was "rent" and by transition, the word came to mean the land out of which the rent flowed. "Rent" is also defined as "lease". It is not until the fifth notation in the Oxford compendium that we find "farm" defined as "Originally a tract of land held on a lease for the purpose of cultivation; in modern use often applied without respect to the nature of the tenure, sometimes modified by substantive prefix, as *dairy-*, *grass-*, *poultry-farm*."

3. Random House Dictionary of English Language, Unabridged (1966).
4. Oxford English Dictionary (1971).
5. *Id.*

thoroughbred horses is such an activity as was contemplated by the parties under the exclusion of "farming" from the definition of business activities. Appellees contend just as strenuously that Boniface was in the business of breeding and racing thoroughbred horses and that this activity was covered by the terms of the policy which denied coverage for bodily injury and property damage arising out of the business pursuits of the insured.

There is a paucity of instructive legal precedent available for determining the meaning of the word "farming" in an insurance policy of this type. The case factually closest to the one *sub judice* is *Wint v. Fidelity & Casualty Company of New York,* 9 Cal. 3d 257, 107 Cal. Rptr. 175, 507 P.2d 1383 (1973). There, the insured — for profit — trained and broke horses, trained riders, advised owners and riders, showed horses, and bred horses of his own and those owned by others. The insured carried out these activities on two parcels of land: One was a 12-acre parcel on which there was a house occupied by the insured, a riding ring, a small office, a cook's shack, a hay barn, paddocks, and a stable. This parcel was surrounded on three sides by a 500-acre pasture which was fenced in, with a chained and locked gate on the exterior perimeter and another gate between it and the 12-acre parcel. Sometime during the night, several horses escaped from the pasture; and one of them, which was owned by a customer of the insured, ventured onto a road where it was struck by an automobile, the result being that both the driver and the horse were killed. Fidelity had covered the insured under a Farmers' Comprehensive Personal Liability Policy which excluded coverage for any injury arising out of a business pursuit of the insured and defined "business" to include "trade, profession or occupation, other than farming." Although the Court found that the pasturing of horses for a fee would normally be regarded as a business pursuit, it concluded that Fidelity was liable to its insured because of the exclusion stated in its policy. The Court held:

> "Fidelity's policy specifically defines 'business' to include 'trade, profession or occupation, *other*

than farming . . . .' While McGregor's 'riding club' venture may well be considered beyond any reasonable interpretation of 'farming,' the broad term 'farming' is not limited merely to the cultivation of the soil, but includes, in addition, the raising and *grazing* of animals. (See, e.g., *Security-First Nat. Bk. v. Pierson,* 2 Cal.2d 63, 64-65, 38 P.2d 784.) It is not entirely clear from the record how closely interrelated the 'riding club' and 'grazing' activities may have been; but in view of the broad reach of the policy's undefined 'farming' terminology, coverage or noncoverage of the grazing activities appear to be, at the very least, ambiguous, thus subjecting the insurer to liability.

. . .

"There is nothing in the record to indicate that McGregor engaged in any other farming activities; and to exclude the entire grazing operation would cut the heart out of the special coverage afforded by this farm-oriented comprehensive policy. As hereinabove stated, the policy fails to define 'farming,' and grazing can reasonably be interpreted to constitute a farming operation. Consequently, the nonfarming business exclusion is inapplicable, since, as pointed out above, any ambiguity must be construed against the insurer." (Emphasis in original). 107 Cal. Rptr. at 178-79.

The trial court in the case before us chose to rely upon the dissenting opinion in the *Wint* case, where it was stated "that the activities of the insured from which the accident arose had nothing to do with farming in any sense of the word but were part and parcel of his business of operating a riding academy and boarding stable." 107 Cal. Rptr. at 182. It was the view of the dissenting opinion and the trial court that the "Farmers' Comprehensive Personal Liability Policy" issued by the insurer in *Wint* was essentially a homeowners' policy tailored to the special needs and

210

requirements of persons who live in rural areas and engage in those activities of a general agricultural nature.

Two cases in Maryland considering the meaning of the word "farming" are *Supervisor of Assessments for Montgomery Co. v. Alsop*, 232 Md. 188, 192 A. 2d 484 (1963) and *Keeney v. Beasman*, 169 Md. 582, 182 A. 566 (1936). *Alsop* involved a claim by a retired businessman that his property, which was formerly a dairy farm, was entitled to the lower tax rate applicable to farm property because he allowed a neighbor to graze from forty to fifty head of cattle and to grow and cut hay on the land in exchange for general farm maintenance work. Affirming the Circuit Court's finding that the land was primarily used for farming, the Court stated:

> "[T]he land is used as a pasture for grazing forty or more beef and dairy cattle and for the production of hay to feed such cattle during the winter months; and that the proportion of the farm used for agricultural purposes is far in excess of the proportion used as a curtilage to the main dwelling and as yards and vegetable gardens appurtenant to the rented houses. This was enough to require a finding that the land was in fact a bona fide farm .... In the instant case it seems clear that the grazing and feeding of a herd of more than forty head of beef and dairy cattle on the land in question throughout the year is a 'farm or agricultural use' within the meaning of the constitutional and statutory provisions." 232 Md. at 194.

*Keeney v. Beasman, supra,* involved a claim for workmen's compensation which was defended on the ground that the employee of a dairy farm operation was a farm laborer and therefore not covered under the Workmen's Compensation Law. The Court said:

> "Literally, *agri cultura* means the tillage or cultivation of the soil. But, like many words

compounded of different elements, it has a meaning of its own broader than that of its elements considered separately, for from time immemorial it has been regarded as synonymous with husbandry, and includes, not only the cultivation of the soil and the raising of crops, but also 'gathering in the crops and raising live stock' . . . .

. . .

"In *Rawle's Edition of Bouvier's Law Dictionary* this definition is given: 'The cultivation of soil for food products or any other useful or valuable growths of the field or garden; tillage, husbandry; also, by extension, farming, including any industry practised by a cultivator of the soil in connection with such cultivation, as breeding and rearing of stock, dairying,' etc. In *Philadelphia v. Davis*, 6 Watts & S. (Pa.) 269, 279, 'farm products' were held to be 'swine, horses, neat cattle, sheep, manure, cordwood, hay,' as well as 'vegetables, fruit, eggs, milk, butter, lard, and other provisions for the mouth.' In *Davis v. Industrial Commission*, 59 Utah, 607, 206 P. 267, 268, a sheep herder was held to be an 'agricultural laborer.' " 169 Md. at 586-87.

See also, *Beyer v. Decker*, 159 Md. 289, 150 A. 804 (1930).

In a zoning case, where the ordinance permitted farming in a residential zone, a farmer who had previously conducted a dairy business upon the premises changed the use of the premises to horse raising. The Supreme Court of New Jersey in *Stout v. Mitschele*, 135 N.J.L. 406, 52 A. 2d 422 (1947), held that there was no violation of the zoning ordinance, as the owner's activities still constituted farming. The Court stated:

"We do not think it can be said that the record before us shows that the raising of horses as conducted is not farming. It certainly is a form of farming and was incidental to that occupation from the earliest times. The farmer needs to raise

animals quite as much as crops of wheat and corn. Some specialize in one branch of the enterprise and others in a different branch, but animal husbandry is as important for the success of farming as the growing of grain, corn and hay." *Id.* at 424.

In *Weddle v. Parrish*, 295 P. 454, 455 (Ore., 1931), it was held that the "management of live stock, such as depasturing and feeding sheep is embraced within the term 'agriculture' or 'farming'."

In *Porter v. Yakima County*, 77 Wash. 299, 137 P. 466 (1914), a case involving the imposition of personal property taxes, the Supreme Court of Washington said that, "A tract of land devoted to the breeding, grazing, shearing, and lambing of sheep is a farm as much as a tract that is devoted to the growing of grain or to diversified farming. In short, a tract may be a farm without the aid of a plow." 137 P. at 467.

In *State ex rel. Wahluke Inv. Co. v. Superior Court for Walla Walla Co.*, 168 Wash. 142, 10 P. 2d 986 (1932), a later Washington case involving the right of a mortgagor to retain possession of land used for "farming purposes" during the redemption period, the court said:

> "Some contention is [sic] made in behalf of the investment company rested upon the theory that the statute giving to the purchaser a lien upon 'the crops raised or harvested' upon the land for interest on the purchase price, if the owner does not redeem, argues that the words 'used for farming purposes' mean only such land as produces growing crops thereon capable of being subjected to such lien. We do not think this suggestion is persuasive of any such limited meaning to be attributed to the words 'used for farming purposes.' Those words seem to us to mean stock-raising purposes as well as crop-raising purposes." 10 P. 2d at 987-88.

In *Country Mutual Insurance Company v. Watson*, 1 Ill. App. 3d 667, 274 N.E.2d 136 (1971), the court was presented with a situation in which a liability policy defined "business"

as "a trade, profession or occupation other than farming" and excluded liability arising out of any business pursuit of the insured; other activities which were "ordinarily incident" to non-business pursuits were covered by the policy. The insured entered into an agreement with the State Department of Family Services in which he agreed, for a fee, to accept certain children for placement on his farm. One of the boys so placed sustained an injury to his eye while cutting string on bales of hay which were to be fed to the cattle on the farm. The insurer denied coverage, claiming that the accident arose out of the business activity of the insured, i.e., that the acceptance of a fee for the placement of the boys constituted a business activity within the meaning of the policy. The court held that the insured was in the course of his non-business pursuit of farming and that the cutting of the string on the bales of hay was an activity "ordinarily incident" to that non-business pursuit. *See State Farm Fire & Cas. Co. v. MacDonald,* 87 Ill. App. 2d 15, 230 N.E.2d 513 (1967).

Our examination of these authorities and of the facts in this case convinces us that while some of the activities carried on at Bonita Farms might well be characterized as the operation of a business for the breeding, training and selling of horses, a substantial portion of the activities incident to that business should be characterized as farming. As an analogy, we offer the hypothetical situation in which Bonita Farm was being operated for the breeding and sale of cattle. If a bull escaped from a pasture and was involved in a similar accident, could Brethren avoid liability under its policy on the ground that Bonita was not engaged in farming? We think not.

The facts in this case disclose that the brood mare, Sasal, was kept at Bonita Farm for breeding purposes only, that she never raced, nor was she ever in training for racing. Although she was bred in the spring of 1973, she was barren and was therefore kept in a pasture away from the mares in foal. It was from this pasture that she escaped. We agree with *Wint, supra,* that the grazing activity "can reasonably be interpreted to constitute a farming operation" and is

therefore not excluded under the exclusionary clause of the policy. There is no suggestion in this case — as there was in *Wint* — that the grazing activities at Bonita Farm were a part of providing "grazing for hire." Sasal belonged to the Bonifaces and her pasturing was, we believe, a farming activity. When we apply the requirement that the ambiguity in this case be resolved against the company which prepared the policy and in favor of the insured, we have no difficulty in reaching the conclusion that the trial court was clearly erroneous in its factual conclusion that this incident was not covered within the meaning of the exclusionary clause. We shall reverse.

## (2) and (3)

Two questions raised by the parties remain unanswered by our conclusions on the first issue: First, is Aetna entitled to receive from Brethren one-half of the legal fees and other costs expended by Aetna in defending Boniface when both Aetna and Brethren were obligated to do so and Brethren refused to provide such defense?; and secondly, is Brethren obligated to reimburse Boniface and Aetna for attorneys' fees and other costs incurred in the declaratory judgment action to determine the dispute between the parties?

Neither of these issues was reached by the trial court because of its determination that Boniface was not covered under Brethren's policy. We are urged to consider and determine them under Rule 1085, which gives us the discretion to decide issues not decided in the trial court where it is necessary and desirable for the guidance of that court and would avoid the necessity of another appeal. We decline to do so. The record is devoid of any facts from which we could determine what portion of the counsel fees and other costs should be paid by the contending parties. To assess one-half of these costs and expenses without any knowledge as to what they are or as to their reasonableness would be arbitrary and capricious. Further, the record fails to disclose what, if any, expenses Boniface is claiming and whether under the law he is entitled to reimbursement for them. We prefer to wait until the light of sweet

reasonableness has been given an opportunity to dispel the darkness of controversy in this matter. We believe that men of good will should be able to resolve the problem without our intervention. If our belief is ill-founded, then we will consider the matter on another day with a proper record before us. Sufficient unto the day is the evil thereof.

*Declaratory decree vacated.*
*Remanded for entry of a decree not*
*inconsistent with this opinion.*
*Costs to be paid by appellees.*