■ COUNTY OF BROOME, Appellant, v TRAVELERS INDEMNITY COMPANY, Respondent. — Appeal from that part of an order of the Supreme Court at Special Term (Zeller, J.), entered August 12, 1981 in Broome County, which granted defendant's motion for summary judgment dismissing the complaint and denied plaintiff's cross motion for summary judgment. In April, 1979, plaintiff County of Broome (county) entered into an agreement with several local business concerns (hereinafter sponsors), which granted them a license to use the county arena for a bridal show to be held January 6, 1980. The agreement required the sponsors to procure liability insurance pertaining to the exhibition and to include the county as a named additional insured. The sponsors also agreed to reimburse the arena for "all expenses for security in relation to the Licensee's performance". On January 5, 1980, the sponsors began preparing the displays in the arena and bringing in the bridal gowns and other merchandise to be exhibited. It was also contemplated that, as part of the exhibition, various other local merchants would display their wares, and these, too, were brought upon the premises on January 5, including a new Datsun automobile owned by a local dealer, Parkway Auto Sales and Service. The vehicle was delivered to the sponsors, who saw to its placement on the arena floor. During the late evening of January 5, after everyone connected with the bridal show had left the arena, an off-duty county maintenance employee approached the single county security officer in attendance at the rear door of the building and obtained permission to enter. Shortly thereafter, the security guard observed that individual fleeing the premises near a point where he also observed the Datsun smashed against a support pillar. When the automobile dealer commenced an action against the county for the damage to the vehicle, defendant insurance company disclaimed coverage based on the exclusion contained in the policy concerning claims for property damage to "property in the care, custody or control of the Insured or as to which the Insured is for any purpose exercising physical control". Plaintiff thereupon commenced the instant action for a declaratory judgment establishing its rights to indemnification and defense under the policy. Special Term held that the exclusion applied, reasoning that because the vehicle was on county property and security services by the county had been undertaken, the county had care and custody, even though it might not have had control of the vehicle. In our view, the evidence and inferences to be drawn therefrom do not support that determination. The primary bailment of the Datsun was to the sponsors and the county had no right to exercise physical dominion over the vehicle. The requisite care, custody, or control is dependent upon the insured's rights and acts concerning the specific damaged property out of which the claim of liability arises (*Hardware Mut. Cas. Co. v Mason-Moore-Tracy, Inc.*, 194 F2d 173). Thus, the county's access to and control over its own building, where the vehicle was located, is not decisive. Put another way, the mere constructive possession of the vehicle by the county arising out of its being on county property is insufficient to make the exclusion applicable. Such constructive possession of the damaged property in question existed in both *Neville v*

*Continental Cas. Co.* (26 AD2d 853) and *Rochester Woodcraft Shop v General Acc. Fire & Life Assur. Corp.* (35 AD2d 186), but was held insufficient in the absence of the insured's actual use or right to exercise physical dominion over that damaged property. The policy exclusion clauses in *Neville* and *Rochester Woodcraft* were identical to that presented here. The fact that at the time the loss occurred there was nothing to prevent a county employee from entering and using the vehicle is also not sufficient, since there was no legal right to do so (see *Great Amer. Ind. Co. of N.Y. v Saltzman,* 213 F2d 743, 747-748). Special Term's reliance on the county's undertaking to provide security at the arena as establishing care, custody, and control was also misplaced. The written agreement between the county and the sponsors referred only to security "in relation to the Licensee's performance", and not to the day before the bridal show. In accordance with its agreement, the county hired additional security personnel for the day of the show, but only maintained its regular force of a single guard for the evening when the loss occurred. Neither the agreement nor the vague oral assurance to the sponsors that there would be security at the arena the preceeding night permits the inference that the county undertook to safeguard the specific items placed in the arena for the next day's exhibition. Providing general security over the building, with no right to exercise exclusive dominion and control over its contents, is, under *Greater N.Y. Mut. Ins. Co. v Professional Security Bur.* (61 AD2d 975), insufficient to establish care, custody, or control. Moreover, requiring defendant to indemnify and defend plaintiff concerning the loss here does not extend coverage beyond risks fairly intended by the parties and purchased under the insurance contract. This policy was not the typical "Owners, Landlord's, and Tenants" one, intended generally to cover liability arising out of defective conditions of real property and not claims from bailments of personal property accepted by the insured (see *Monari v Surfside Boat Club,* 469 F2d 9, 11). Here, the policy defined the risk as "premises and operations" involved in "exhibitions in buildings - trade or educational exhibitions". Before issuing the policy, defendant presumably ascertained what the operation of the exhibition it insured entailed, including the necessity for bringing merchandise to the arena the day before the exhibition. If defendant intended to exclude coverage for risk of damage to that merchandise, it should have provided so specifically, and not through the care, custody and control exclusion (cf. *Allison v National Ins. Underwriters,* 487 SW2d 257 [Mo]). For the foregoing reasons, that part of the order of Special Term which granted defendant's motion for summary judgment should be reversed and summary judgment granted to plaintiff on its complaint. Order modified, on the law, by reversing so much thereof as granted defendant's motion for summary judgment and denied plaintiff's cross motion for summary judgment, motion denied and cross motion granted, and judgment directed to be entered declaring that defendant is required to defend and indemnify plaintiff in the action brought by Parkway Auto Sales and Service, and, as so modified, affirmed, with costs to plaintiff. Mahoney, P. J., Weiss and Levine, JJ., concur; Casey, J., concurs in part and dissents in part in a memorandum; Yesawich, Jr. J., dissents and votes to affirm in a memorandum.

Casey, J. (concurring in part and dissenting in part). While I agree with the majority that the record is insufficient to grant defendant's motion for summary judgment, I cannot agree that summary judgment for plaintiff is warranted. In my view, the evidence submitted by the parties on these motions creates a question of fact concerning plaintiff's care, custody and control of the automobile. The weight to be accorded the evidence and the inferences to be drawn therefrom are for the trier of fact, not for the court on a motion for summary judgment.

Yesawich, Jr., J. (dissenting). I would affirm. The county expressly undertook to furnish security on the day before and the day of the bridal show. The following unrefuted testimony by the sponsor's representative, given during an examination before trial, regarding the extent of that undertaking, is especially noteworthy: "Q. With respect to the security arrangements, what was your understanding concerning security when the show was not in progress, that is, before the show and after the show? A. The Arena people had said to me that there would be security there on Saturday and Sunday. We specifically asked them for security on Saturday, because not only were the cars there, but I had about $10,000 worth of wedding gowns in the locker rooms. Q. Saturday, the fifth, was the set-up day? A. Yes. And the cars were brought in that day. They had to all be brought in that day because once the booths were set up, there was no way of driving them in. And we, Danel's, had set up our booth. As I said, I had wedding gowns in the locker rooms and other people had brought in their merchandise, too. So, we asked the Arena to make sure there would be security because there was a lot of other merchandise other than the cars in the Arena. Q. Did you have to pay extra for that security? A. Yes, we did. Q. Why were they charging you for the security? A. Why were they charging for the security? Q. Yes. Did you question them at all? A. Because they were providing security for the things that we had in the Arena, protection. Q. And they specifically said that the security was being provided for those items in the Arena? A. Yes. I would have understood that to be so. Otherwise why would I need security? Q. But you were informed, though, that security is provided at the Arena? A. Definitely. That's why we brought the things in the day before. That's why I brought my wedding gowns in the day before. Because they were supposed to be - everything was supposed to be secured." In light of this commitment to protect the exhibitors' property, Special Term properly concluded that at the time the incident occurred, namely in the early morning hours and after the arena had been locked by a county employee, the car, while it remained on the county's property, guarded by a county employee for whose services a fee had been sought and paid for, was then in the county's care and custody.