**Dennis EISENBARTH, Appellant (Plaintiff),**

v.

**HARTFORD FIRE INSURANCE COMPANY, a Connecticut insurance corporation, licensed and authorized to do business in the State of Wyoming, Appellee (Defendant).**

**No. 91–230.**

Supreme Court of Wyoming.

Nov. 4, 1992.

Rehearing Denied. Dec. 16, 1992.

James A. Eddington of Jones, Eddington & Weaver, Torrington, for appellant.

Stuart R. Day of Williams, Porter, Day & Neville, Casper, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT *, and GOLDEN, JJ.

CARDINE, Justice.

Appellant Dennis Eisenbarth (Eisenbarth) sought to recover damages from his insurer, appellee Hartford Fire Insurance Company (Hartford). Hartford determined that its farm-ranch policy excluded coverage for damages arising from the death of cattle which were pastured in Eisenbarth's corn field. The policy excluded coverage for damage to property which was in Eisenbarth's "care, custody or control." The district court granted summary judgment in favor of Hartford, and Eisenbarth seeks review of that order.

We reverse and remand with instructions that the summary judgment for Hartford be vacated, that the issue of "care, custody or control" be presented to the fact finder, and for such further proceedings as are necessary to adjudicate Eisenbarth's unresolved claims.

Eisenbarth tenders this statement of the issues:

Did the defendant [Hartford] have a duty to defend plaintiff and did the lower court err in vacating its prior granting of partial summary judgment in favor of plaintiff on defendant's failure to defend plaintiff on a claim of negligence which was covered by the farm liability policy purchased by plaintiff?

Did the lower court err in reversing its prior decision and granting summary judgment to defendant on the applicability of the "care, custody [or] control" exclusion contained within the farm liability policy purchased by plaintiff?

Hartford answers with this abstract of the issues:

Did the trial court properly grant summary judgment to the appellee on the

---

* Chief Justice at time of oral argument.

basis that appellee had no duty to defend appellant for an occurrence excluded from coverage by the "care, custody or control" exclusion contained in appellant's farm liability policy?

The facts are really not much in dispute, though there is a great difference of opinion as to their significance. After some preliminary discussions in late 1985, Eisenbarth agreed by written contract signed on January 10, 1986, "for boarding approximately 100 cows on corn stalks for approximately 60 days * * *." The cows were owned by Donald E. Brooks whose ranch is located just north of Lusk, over 60 miles from Eisenbarth's farm. Many stockmen were grazing cattle on corn stalks that winter because feed was in short supply. Eisenbarth had had cattle of his own before and was considering acquiring cattle again at the time he entered into the contract with Brooks, but because Brooks was in a bind, he decided to enter into the boarding contract. The cattle were trucked to Eisenbarth's farm on January 9, 1986, and arrived there about 3:00 p.m. The cows were maintained in a corral until the following morning when Eisenbarth turned them out into the corn field in accordance with Brooks' instructions and the boarding agreement. The cattle grazed in the corn field for about two hours that day. Many of the cattle returned to the corral on their own to drink, but those which had not were herded back to the corral by Eisenbarth. About 3:00 p.m. on January 10, Brooks arrived at Eisenbarth's farm and brought salt and mineral for the cows which Eisenbarth fed to them. The boarding contract was also signed that day. Over the next several days, Eisenbarth continued to let the cattle into the corn field and then herd them back to the corral, after a couple hours of feeding, as he did on the first day. Brooks made clear to Eisenbarth that he did not want supplemental feeding because of costs, rather he wanted the cattle to feed on the corn stalks as per the agreement. On Monday, January 13, 1986, Eisenbarth first noticed that a cow was sick. He contacted a veterinarian to examine that cow, as well as others that became sick over the next 24 hours. He

also tried to contact Brooks but was initially unable to get through to him because of a telephone problem at Brooks' ranch. Brooks was finally able to get to Eisenbarth's place on Tuesday afternoon, and from that point forward, Brooks worked with the veterinarians to treat the cattle which were sick and dying. Ultimately, 31 of the cattle died. On January 16, Eisenbarth reported the situation to his insurance carrier.

Brooks filed suit against Eisenbarth alleging, *inter alia*, negligence on the part of Eisenbarth. Hartford determined the claim was excluded by the "care, custody or control" language of its policy and refused to defend. After trial, a jury found that Brooks was 40 percent negligent and Eisenbarth was 60 percent negligent, and judgment was entered against Eisenbarth accordingly. The proceedings in that case are not a part of the record in this matter.

On July 13, 1987, Eisenbarth filed his complaint seeking to recover from Hartford $7,103.09 as the costs of defending the Brooks lawsuit, $7,994.40 as the judgment he paid in that suit, for interest, for damages for bad faith and distress, for punitive damages, and for the costs and attorney fees for the suit. Hartford petitioned to have the case removed to federal court, and by order entered on September 4, 1987, removal was granted. Because Hartford had failed to seek removal within 30 days after receipt of Eisenbarth's complaint, as required by 28 U.S.C. § 1446(b), the federal court remanded the action back to the Wyoming district court by order entered on November 6, 1987.

By order entered on April 13, 1988, the district court denied Hartford's motion for summary judgment, finding that "[t]here is a genuine issue of material fact relating to the question of care, custody and control, and of defendant's failure to provide a defense * * *." By order entered on June 20, 1989, the district court granted Eisenbarth's motion for partial summary judgment in the amount of $18,245.21 plus attorneys fees and costs yet to be determined. The district court also denied Hartford's motion to reconsider the denial of its

motion for summary judgment. By order entered on October 18, 1989, Eisenbarth was also awarded $12,057.38 as attorney fees and costs for the instant litigation. On March 14, 1990, Richard E. Day of Williams, Porter, Day & Neville, P.C., Casper, entered an appearance on behalf of Hartford. On June 21, 1990, the new counsel filed a motion asking that the district court reconsider or modify the partial summary judgment in favor of Eisenbarth.

On November 17, 1990, Donald E. Jones, a respected member of the Wyoming and Goshen County Bars, who served as counsel for Eisenbarth, died after a lengthy illness. The litigation had been held on the district court's docket because of Mr. Jones' illness, and time was allowed after that untimely and unfortunate occurrence for new counsel to assume the prosecution of Eisenbarth's claims. On September 3, 1991, the district court vacated its prior judgments in favor of Eisenbarth and entered summary judgment in favor of Hartford. A timely notice of appeal was filed on September 17, 1991. The case was heard upon oral argument before this court on May 6, 1992.

We review a summary judgment in the same light as the district court, using the same materials and following the same standards. Summary judgment is proper only where there are no genuine issues of material fact and the prevailing party is entitled to judgment as a matter of law. *American Holidays, Inc. v. Foxtail Owners Ass'n*, 821 P.2d 577, 578 (Wyo.1991), quoting *Zmijewski v. Wright*, 809 P.2d 280, 282 (Wyo.1991).

Our primary function in this instance is to construe the contract of insurance. General principles of construction will be followed when interpreting conditions of an insurance agreement. *Commercial Union Ins. Co. v. Stamper*, 732 P.2d 534, 539 (Wyo.1987).

> Basic tenets stated in *McKay v. Equitable Life Assurance Society of the United States* [421 P.2d 166, 168 (Wyo.1966)], and applied in controversies involving insurance policies in the State of Wyoming are:

> 1. "[T]he words used will be given their common and ordinary meaning. Neither will the language be 'tortured' in order to create an ambiguity."
> 2. "The intention of the parties is the primary consideration and is to be ascertained, if possible, from the language employed in the policy, viewed in the light of what the parties must reasonably have intended."
> 3. "Such [insurance policy] contracts should not be so strictly construed as to thwart the general object of the insurance."
> "* * * [T]he parties have the right to employ whatever lawful terms they wish and courts will not rewrite them."
> 4. "Absent ambiguity, there is no room for construction and the policy will be enforced according to its terms."
> 5. " * * * [W]here such [insurance policy] contracts are so drawn as to be ambiguous and uncertain and to require construction, the contract will be construed liberally in favor of the insured and strictly against the insurer. Also, if the contract is fairly susceptible of two constructions, the one favorable to the insured will be adopted." [citations in the quotation are omitted]

*Commercial Union*, 732 P.2d at 539.

If the language of an insurance contract is plain and unequivocal, our usual rule is that interpretation of the contract is a question for the court to resolve as a matter of law. *Ricci v. New Hampshire Ins. Co.*, 721 P.2d 1081, 1085 (Wyo.1986). A primary objective of interpreting an insurance contract is to ascertain the objectives of the parties and to ascribe to the terms used the plain, ordinary and customary meaning in order to effectuate the parties' intent. *Worthington v. State*, 598 P.2d 796, 806 (Wyo.1979).

Eisenbarth entered into this agreement with Brooks:

> This contract between Don Brooks and Dennis Eisenbarth is entered into for boarding approximately 100 cows on corn stalks for approximately 60 days under the following terms and conditions:

1. The rate charged will be 50 cents per head per day, beginning Jan. 10, 1986.

2. If the corn stalks should become covered with snow to prevent sufficient grazing, other feed will be provided on those days in the amount specified by the owner of the cattle.

3. The price for supplemental feed will be: Alfalfa hay $70 per ton fed; Ear corn $95 per ton fed; Ground oat-sweetclover hay $75 per ton fed; Bean straw $50 per ton fed; Corn silage $28 per ton fed.

4. The 50 cents per head per day rate will not be charged on the days supplemental feeding is necessary.

5. Salt and mineral will be provided but at the expense of the owner of the cattle.

6. A daily count of the cattle will be taken and any cattle not accounted for will be located.

7. The electric fence will be maintained and the cattle managed within the fence.

8. The owner will be notified of any sick cattle.

The word "board," when used as a verb (in its gerund, or verbal noun, form as it was in the agreement between Eisenbarth and Brooks) has a commonly understood meaning:

> *Board* means: "to provide with regular meals or with regular meals and lodging, usually for compensation."

*Webster's Third New International Dictionary*, at 243 (1961).

Eisenbarth did just that, *i.e.*, he made his corn fields available to Brooks, for compensation, so that Brook's cattle would be provided with regular feed and accommodations, either in the fields themselves or in the nearby corrals. Indeed, Eisenbarth's deposition reveals that Brooks did not want anything more than that, and boarding the cattle did not automatically cause them to be in Eisenbarth's care, custody or control under the insurance policy language.

This record demonstrates that leasing pasture and range and pasturing cattle in corn fields, etc., is a common practice in the Wyoming farm/ranch community. In addition, we are comfortable in acknowledging that such "boarding" of cattle is a reality of farming activity in this state. Wyoming farmers and ranchers might well be surprised to learn that by selling the grass or corn in their field to another who puts his livestock in the field, they void coverage of their ranch liability policy and become liable for any loss of livestock. It would be a devastating thing for farmers if they were expected to assume full responsibility for such cattle for the minimal income it provides to them. In this instance, Eisenbarth could have earned a maximum of $3,000.00 for providing feed for these 100 cattle for 60 days. If his farm/ranch liability policy excluded coverage for his operation and he is fully responsible for them, because they were in his "care, custody or control" he faced the prospect of having to pay damages of $50,000.00 to $100,000.00! According to the written agreement of the parties, the only thing Brooks paid for was the feed.

 The meaning of the terms "care, custody or control" is, to a large extent, dependent upon circumstances. *Employers Mutual Liability Ins. Co. v. Puryear Wood Products Co.*, 247 Ark. 673, 447 S.W.2d 139, 142 (1969) (insured did not have "care, custody or control" of trailer it was filling with sawdust). The "care, custody or control" clause is almost universally used in liability policies, but its construction is to a large extent dependent upon circumstances, and the phrase should be applied with common sense and practicality. *Hardware Mutual Casualty Co. v. Crafton*, 233 Ark. 1020, 350 S.W.2d 506, 507 (1961) (and cases cited therein) (insured did not have "care, custody or control" of car which he parked for person using his dock facilities); and *see American Family Mutual Ins. Co. v. Bentley*, 170 Ind.App. 321, 352 N.E.2d 860, 864–65 (2 Dist.1976) (boy scout leader did not have "care, custody or control" of troop equipment which he stored on his premises in a small shed which was rented to the troop). These cases teach that the fact that merely because the cattle were on land owned by

Eisenbarth and within his fences does not in and of itself mean that they were within his care, custody or control as those terms are used in a ranch comprehensive liability policy.

■ A liability policy is designed to *insure against accidents of the trade*, though not to guarantee the moral hazards of a claim based upon property owned, rented or used by the insured where the insured might benefit by falsely claiming that the property was damaged by accident or by exaggerating the loss. *Royal Indemnity Co. v. Smith*, 121 Ga.App. 272, 173 S.E.2d 738, 740 (1970) (painter was only in control of outside of tank it was painting and not of an interior mechanism which was damaged in the process of painting the tank). That court also opined, we think appropriately, that were it to determine whether the damaged mechanism was under the insured's "control," that it would soon be counting angels as well as splitting hairs! In regard to the "moral hazard" question, also *see United States Fire Ins. Co. v. Schnabel*, 504 P.2d 847, 850 (Alaska 1972). To the extent Eisenbarth did somewhat more than board the cattle, he apparently did it as an accommodation to Brooks, out of an innate sense of good husbandry, and in compliance with governing law. W.S. 6–3–203 (1988) (cruelty to animals); W.S. 11–29–106 and 11–30–112 (1989) (cruelty to animals and abuse or negligent treatment by bailee).

As noted above, we will not construe a contract of insurance so strictly as to thwart the general object of the insurance. This policy was designed to provide liability insurance protection to Eisenbarth in conducting his farm operations. *See Aetna Casualty and Surety Co. v. Brethren Mutual Ins. Co.*, 38 Md.App. 197, 379 A.2d 1234, 1238–43 (1977), for a thorough discussion of what constitutes "farming." If Hartford wished to exclude this particular sort of farming activity, it could easily have provided for the exclusion more specifically than through the "care, custody or control" exclusion, since the activity Eisenbarth engaged in was wholly consistent with a farm operation. *See County of*

*Broome v. Travelers Indemnity Co.*, 88 A.D.2d 720, 451 N.Y.S.2d 272, 274 (1982).

■ Under these circumstances, we must give our primary attention to what these parties intended. Did Brooks intend to give "care, custody or control" to Eisenbarth? Did Eisenbarth intend to assume such a level of responsibility? A jury decided in the case between Brooks and Eisenbarth that Eisenbarth was negligent (60%) in his feeding of the cattle, but that Brooks was also negligent (40%). While not determinative of the issue here presented, this jury apparently found at least joint responsibility and some level of joint care, custody or control. The question then is what are the limits of the exclusion intended by the "care, custody or control" language in the Hartford policy. Must Eisenbarth have total care, custody or control (100%) in all decisions affecting the livestock? What is the effect of minimal or joint care, custody or control? What level of "care, custody or control" calls the exclusion to play? Does it mean any level, some level, or complete "care, custody or control?" It would have been a simple matter for the writer of the insurance contract to clearly state that care, custody or control of its insured, no matter how slight, would exclude coverage if that was the intent of the parties. Having failed to do so, we hold that total (not shared) care, custody or control is necessary for the exclusion to apply. Whether there was total care, custody or control in Eisenbarth is a genuine issue of material fact which precludes application of the exclusion as a matter of law. We conclude, therefore, that whether the insured was exercising that degree of "care, custody or control" over property at the time of injury as would exclude coverage under his insurance policy is a question that should be resolved by the trier of fact. *Arnold v. Adventure Line Mfg. Co.*, 209 Kan. 80, 495 P.2d 1007, 1011 (1972); *Arrigo's Fleet Serv. Inc. v. Aetna Life & Casualty Co.*, 54 Mich.App. 482, 221 N.W.2d 206, 212–14 (1974).

Hartford relies on several cases which have resolved similar issues regarding in-

terpretation of a "care, custody or control" exclusion to the benefit of the insurer. To some extent, the cases are factually distinguishable, but more importantly we simply do not find them persuasive because, to the extent they are applicable in the instant case, they are contrary to the applicable rules of contract interpretation. We begin our discussion of these cases with this general direction in mind:

> One of the more common forms of liability policies now written is upon farmers, and these inevitably will continue to become of greater importance as time progresses. Necessarily they partake of a combination of coverages, including comprehensive personal liability, use of powered equipment, acts of animals, employer's liability, and other features. Irrespective of the amount of the premium charged, whether great or small, the purpose of the farmer in purchasing coverage is clear, his needs are known, and such policies should be construed liberally to grant the protection sought.

> The basic principles governing the construction of insurance policies in general are fully applicable to a comprehensive farm liability policy, though such policy is designed specifically for the protection of those engaged in farming. *A provision providing for coverage for the loss of property of others caused by the insured or arising out of farming operations will be given a reasonable interpretation to find coverage where possible.* [emphasis added]

7A Appleman, *Insurance Law and Practice*, (Berdal ed. 1979) § 4501.17.

In the case *Howard Associates, Inc. v. Home Indemnity Co.*, 34 Colo.App. 390, 528 P.2d 980 (1974), the Colorado Court of Appeals found that an auctioneer had "control" of 19 cattle which were trampled to death in a stampede while held by him for further transport, or at least that degree of control contemplated by the exclusion. We find sufficient distinction in that case in that the auctioneer was in total control, not expected to contact the owner, but only transport the cattle. The decision is not persuasive.

In *Insurance Co. of North America v. Adkisson*, 121 Ill.App.3d 224, 76 Ill.Dec. 673, 459 N.E.2d 310 (3 Dist.1984), the "care, custody or control exclusion" was held to apply in circumstances where the insured placed a stud bull in his livestock trailer which he was transporting home to service his cows. The exclusion was applicable where the insured failed to secure the trailer door and the bull fell from the trailer during transport and died of his injuries. Those circumstances are also readily distinguishable from the instant case. The insured was in total control of all aspects of transportation—not expected to consult the owner about the same. We also note that that decision conflicts virtually head on with *Garvison v. St. Paul Fire and Marine Ins. Co.*, 96 Or.App. 85, 771 P.2d 310 (1989) (horse trainer can be caring for animal without necessarily having "physical control"). The case *Asam v. American Liberty Ins. Co.*, 413 So.2d 1056 (Ala.1982), is also distinguishable on its facts, but more importantly because it contains only conclusions with regard to the scope of a "care, custody or control" exclusion.

The district court erred in granting summary judgment for Hartford. Reversed and remanded to the district court with directions to vacate the summary judgment for Hartford, that the issue of "care, custody or control" be presented to the fact finder, and for such further proceedings as are necessary to adjudicate Eisenbarth's unresolved claims.

MACY, C.J., filed a dissenting opinion in which GOLDEN, J., joined.

GOLDEN, J., filed a separate dissenting opinion.

MACY, Chief Justice, dissenting, with whom GOLDEN, Justice, joins.

I dissent. I cannot disagree with the majority's recitation of established law as it is applied to insurance agreements. The problem is that the majority is not looking at the contract between the parties to the insurance contract to determine their intent but is looking at the livestock boarding

contract between Eisenbarth and Brooks to determine what they intended. What they intended has nothing to do with what Hartford Fire Insurance Company intended when it drafted the insurance agreement.

The care, custody, and control exclusion states:

This policy does not apply:

. . . .

2. Under Coverage G—Personal Liability:

. . . .

d. to property damage to property occupied or used by the Insured or rented to or in the care, custody or control of the Insured or as to which the Insured is for any purpose exercising physical control[.]

This language is clear and unequivocal and means what is says; i.e., if Eisenbarth had either the care, custody, or control of Brooks' livestock, Hartford Fire Insurance Company would not be liable for any loss of Brooks' livestock. It is that simple. The facts clearly show that Eisenbarth, at a minimum, had custody of Brooks' livestock regardless of what Eisenbarth and Brooks intended by their contract.

We should not torture the meaning of words in order to create an ambiguity so that a different result can be achieved. Absent any ambiguity, the policy should be enforced according to its terms.

GOLDEN, Justice, dissenting.

I join in Chief Justice Macy's dissent; in addition, I write separately, and only briefly, to voice my concerns about several other points raised by the court's opinion.

The court's opinion ignores the undisputed facts, most if not all of which come from the insured's own testimony. The insured conceded that until his "boarding" agreement with Brooks, he had never taken in another's cattle to feed on his corn stalks. The insured's farming business was raising an irrigated crop, not feeding another's cattle. The insured conceded that under his agreement with Brooks, he (the insured) was to take care of the cattle as if they were his own. The court strains to characterize the "boarding" agreement as a pas-

turing agreement, ignoring the express terms of the agreement which place the cattle in the insured's possession and require him to provide them with owner-obtained feed if the snow covers the corn stalks, to provide them with owner-obtained salt and mineral, to take a daily count of them, to locate any cattle not accounted for, to maintain an electric fence and manage the cattle within that fence, and to watch the cattle for signs of sickness and notify the owner of any sick cattle. Implicitly, and as a matter of common sense, the agreement required the insured daily to take the cattle to and from his corral and corn field. The insured conceded that he placed bean straw in his corral before the cattle arrived so that they would be on a dry surface. He provided the cattle water in the corral. He discussed with Brooks the amount of time the cattle should be allowed to graze on the corn stalks, stating, in his view, he should limit them to two hours a day at the outset, rather than let them graze for an unlimited time. Having obtained Brooks' consent on this point, the insured monitored the grazing time accordingly. The insured's activities under the agreement were required; they were not, by any stretch of the court's imagination, merely the insured's voluntary "accommodation."

I am baffled by the court's taking judicial notice of what would surprise a farmer like the insured or a rancher like Brooks. In my view those matters are not the kinds of things of which courts may take judicial notice. I am amused by the court's lame attempt to "distinguish" the livestock and agriculture cases dealing with the "care, custody or control" exclusion on which the insurer relies; tellingly, the court has no livestock and agriculture cases dealing with that exclusion on which to rely.

Finally, I fail to understand why the court has remanded the case for the trier of fact to decide whether the insured was exercising *that degree* of "care, custody or control" over the cattle as would exclude coverage under the insurance policy. In violation of our appellate rule, the court has already rewritten the contract (insurance policy) by holding that, as a matter of law, the exclusion applies only if the ·in-

sured exercised *total* (not shared) care, custody or control. Further, the court has characterized as irrelevant "accommodation" all of those expressly and implicitly required activities performed by the insured beyond the "pasturing" of the cattle. Since the court has clearly indicated the result it desires and has stacked the cards accordingly, why prolong the inevitable?

In summary, I find no genuine issues of material fact and would hold that, by application of the unambiguous exclusion to the undisputed facts, the insurer is entitled to judgment as a matter of law.