58 N.Y.2d 753 (1982)
County of Broome, Respondent,
v.
Travelers Indemnity Company, Appellant.
Court of Appeals of the State of New York.
Argued November 12, 1982.
Decided December 15, 1982.
John P. Rittinger for appellant.
John E. Murray, County Attorney (Alfred Paniccia, Jr., of counsel), for respondent.
Concur: Judges JASEN, GABRIELLI, JONES, WACHTLER. Judge FUCHSBERG concurs in an opinion. Judge MEYER dissents and votes to reverse in another opinion in which Chief Judge COOKE concurs.
Order affirmed, with costs, for reasons stated in the memorandum of the Appellate Division (88 AD2d 720).
*756 FUCHSBERG, J. (concurring).
This is a very close case, both on the merits and in its litigation history. The Appellate Division's order of reversal was accompanied by an unsigned memorandum to which one Judge filed a partial dissent and a second a full dissent. In our own divided court, the two dissenters support their views in a carefully molded opinion which critically analyzes the reasoning and authorities on which the majority at the Appellate Division acted. In this circumstance, instead of joining in the majority's summary adoption of the memorandum below, I prefer to articulate the reasons for my vote.
At issue in this declaratory judgment action is plaintiff County of Broome's entitlement to a defense and indemnification under a "premises and operations" policy of liability insurance issued by defendant The Travelers Indemnity Company.[1] The claim on which The Travelers disclaimed was one brought against the county by the owner of an automobile which was damaged when it unauthorizedly was moved by a third party on an exhibition floor of the county's Veteran's Memorial Arena, where it had been placed for exhibit at the direction of licensees of the county who were sponsoring a one-day show. The pivotal point is whether, under the circumstances in this case, an exclusionary clause, under which property in the "care, custody or control of the Insured or as to which the Insured is for any purpose exercising physical control" relieved the carrier of responsibility. The sponsors of the show, in obtaining permission to use the arena for the occasion, had agreed, inter alia, to secure property damage insurance for the protection of the county. It presumably was in alleged fulfillment of this obligation that, naming the county as an additional insured, the sponsors purchased the policy which contained the clause in controversy.
The arrangement for the use of the arena was memorialized in a written rental agreement, which, in form required by the county, also provided that the show was to take place on the weekend day of January 6, 1980 and, in preparation for its opening, granted the sponsors access to *757 the premises on the previous day, January 5, when their displays could be brought in and set up by the sponsors and their fellow exhibitors. In addition to the rental fee per se, the agreement also called for payment of so-called "reimbursement expenses" by way of "all expenses for security in relation to the Licensee's performance, and all usual expenses incurred by the Arena in connection with said performance".
It was on the evening of January 5, after the automobile, which the show's sponsors had obtained from a local dealer, had been brought in and located at the direction of the sponsors, that the car, whose keys had been left in its ignition by those who placed it there, was damaged. At the time, the only county employee on duty at the arena was its regular backdoor guard, who, attracted by a bright light on the exhibition floor, came upon the automobile and the fleeing individual who had crashed it; it is undisputed that the backdoor guard's assignment was keyed to the arena as such rather than to the activities or wares of exhibitors, for he was kept on duty around the clock on weekends regardless of whether a show or other event was being carried on by others. Also not controverted is that, while other security guards whose duties went beyond the limited ones of a backdoor guard were engaged, these were only for those hours on January 6 during which the public was to be admitted to the show. It is noteworthy, therefore, that, at an examination before trial in the underlying action brought for the damage to the automobile, while the spokesperson for the licensee testified that she had asked the arena about security on the move-in day, when asked whether it was to be provided specifically for the items being exhibited, her answer in the end was a conclusory "I would have understood that to be so. Otherwise why would I need security?"
Essentially on this record, Special Term opined that the automobile, at the time it was damaged, was, within contemplation of the exclusionary clause, in the care and custody of the county. On cross motions, it thereupon granted summary judgment to the plaintiff. However, the Appellate Division, of the view that the county had no meaningful "right to exercise physical dominion over the *758 vehicle", modified the order appealed from by granting summary judgment to the county instead. For the reasons which follow, I agree with the result it reached.
At the outset of my analysis, I recognize that an exclusion of coverage does not occupy a subordinate position in an insurance policy. For it is established that the protection afforded an insured is spelled out by the net balance which results from a calculation in which a policy's insuring and exclusionary provisions are each entitled to full weight. Just as the former indicate what coverage is included, so, with equal force, the latter indicate what is not (Schiff Assoc. v Flack, 51 N.Y.2d 692, 699).
Concomitantly, of course, when any ambiguity lurks in the language of an exclusion, as in all other parts of a contract of insurance, it is to be liberally construed in favor of the insured, and no less so if this benefits an unnamed rather than a named assured.
So examined, since the clause before us does not specify whether the "care, custody or control" of which it speaks is that of the arena and its contents as a whole or of each of its contents taken separately, the Appellate Division's conclusion that its applicability was "dependent upon the insured's rights and acts concerning the specific damaged property out of which the claim of liability arises" appears eminently correct. All the more is this so in the context of a policy designed, as this one was, to cover, among other things, "exhibitions", comprised, as these most often are, of a miscellany of objects. I therefore focus on the county's relationship to the automobile.
In that connection, one first must look to see not only whether, in the literal language of the exclusion, the county ever assumed physical "care, custody or control" of the car, but whether it did so "for any purpose". Realistically reviewed, I cannot find that it did. Unlike the arena for whose use the sponsors of the show had contracted, at all relevant times the vehicle belonged to the automobile agency and the arrangements for its display at the arena were those made and carried out solely as agreed between the agency and the sponsors, and without the particular permission or participation of the county at all. Indeed, *759 before it arrived, the county had no knowledge that an automobile would be part of the exhibit. Moreover, the record indicates that the county played no part in controlling the time, the place or the movements of the car when it was brought to the arena on January 5 or, later that day, when, at the direction of the sponsors, and to facilitate their arrangement of other exhibits, it was relocated to the area where the trespass to it was to occur.
Most telling perhaps in determining whether "care, custody or control" of the exhibits was lodged in the county is the fact that the agreement, which, by the by, contained a merger clause, did not reserve to it any right to interfere with, much less veto, these or any other aspects of the supervision of any parts of the exhibit. Though, as "standard procedure" under a specific provision of the agreement, the rear guard's wages, along with other arena "operating costs", would be charged to licensees as additional financial emoluments by which the county was recompensed for turning over use of the premises to exhibitors, there is nothing to suggest that the rear guard's duties in fact were enlarged to include specific property of the exhibitors.
For all practical purposes, therefore, the premises were nothing more than the locus for a private event. And, once the county had licensed the arena to the sponsors, by any commonsense definition of the phrase "care, custody and control" the exhibits were to continue in the hands of the sponsors and their exhibitors alone.[2]
Nevertheless, emphasizes the carrier, the county provided a guard. So it did. But the duties of the only guard provided at the time of the occurrence, either as the employee of the county or, all the more, as the "special *760 employee of the sponsors" envisioned in the dissent,[3] were those of the backdoor guard, to be performed alike whether an arena event had been scheduled or not. These obviously were keyed to security of the county's arena as a whole rather than the use or abuse of particular items of merchandise brought there temporarily by exhibitors. On such occasions, his function would not be unlike that of a night guard, commonly employed by the owner of a tenanted loft or office building; the existence of such an employee, though he possesses a master key for access to tenants' premises for the making of "rounds", would hardly be thought to put the tenant's merchandise in the "care, custody or control" of the landlord. Nor, for the purposes of summary judgment, did the conclusory depositional testimony of the sponsors' representative, that she "understood" that more particular guarding was to be provided, suffice to alter this picture (Sutton v East Riv. Sav. Bank, 55 N.Y.2d 550, 553-554).
Finally, on a factually related subject, unlike the dissenters, I find no difficulty with the Appellate Division's interpretation of the agreement's provisions for payment for "all expenses for security in relation to the licensee's performance" as obligating the county to provide security only on January 6, the scheduled day of the show itself, and not on the previous day when the damage occurred. To place the regular guarding not specially employed for the day of the show within the ensuing provision for "usual expenses incurred by the arena" as well as to distinguish it from "expenses for security in relation to the licensee's performance", is consistent with the basic construction principle applicable to contracts and statutes (Messina v Lufthansa German Airlines, 47 N.Y.2d 111, 115, mot for rearg den 47 N.Y.2d 1012), that, if possible, all parts of an agreement are to be given meaning (Sanders v Winship, 57 N.Y.2d 391, 396).
The reality then is that the county was making its arena available as a community resource, while looking to licensees *761 such as the sponsor of the show here to actually put it to use. In this context, the court accorded the words of the agreement their fair and reasonable meaning.
Consequently, the order of the Appellate Division should be affirmed, with costs.
MEYER, J. (dissenting).
The order of the Appellate Division should be reversed and the order of Special Term should be reinstated,[1] the county having failed to produce evidentiary proof sufficient to require a trial on the issue of care, custody or control within the meaning of the policy exclusion.
The fallacy in the reasoning of the Appellate Division, adopted by the majority, is in its conclusion, on the law, that the written agreement between the county and the sponsors of the bridal show limited the county's security obligation to the day of the performance. The agreement required the sponsors to reimburse the county for "all expenses for security in relation to the Licensee's performance" (emphasis supplied). Security in relation to the performance would necessarily be limited to security on the day of the performance only if all activity relating to the performance took place on that day. Because there could be no performance without the displays for the show having been set up, the setup activity is related to the performance in any reasonable sense of the words "in relation to" and, therefore, security in relation to the performance may include security beginning with the setup. That the county understood that it did and so agreed is evident from the fact that it permitted the show to be set up on the day before the public performance, the fact that the contract form, which it drew, elsewhere referred to the day of the performance as "the Presentation" and specified the date of "the Presentation" as "January 6, 1980," and the fact that the bill submitted by the county to the sponsors for security included the wages of both the regular guards who were on duty during the setup period the *762 evening before the day of the performance and the additional security personnel specially hired for the day of the performance only.
Because the words "in relation to" are themselves ambiguous, and all the more so in view of the contract's use of the words "the Presentation" to indicate the day of performance, parol evidence was admissible, notwithstanding the merger clause in the contract, to explain the meaning of "in relation to the Licensee's performance" (Richardson, Evidence [Prince, 10th ed], § 625; Fisch, New York Evidence [2d ed], § 58). The testimony of the sponsor's representative  that she had specifically asked the county for security on Saturday because there would be merchandise there on Saturday and had been assured that there would be security there on both Saturday and Sunday  would, therefore, present an issue for the trier of fact were it not for the county's failure to come forth with evidentiary proof in contravention of that testimony (Zuckerman v City of New York, 49 N.Y.2d 557).
The Appellate Division's additional rationale  that "defendant presumably ascertained what the operation of the exhibition it insured entailed, including the necessity for bringing merchandise to the arena the day before the exhibition" (88 AD2d, p 721)  not only finds no support whatsoever in the record, but also is a non sequitur. The policy was for comprehensive general liability insurance and, therefore, covered both personal injury and property damage. Moreover, it contained 15 separate exclusions of specified types of property damage, each of which excluded coverage for the risk of damage to the merchandise to be shown in the exhibit. A more potent argument would be that the insurer by failing to disclaim as to the sponsors has waived its care, custody and control exclusion because the security guard, whose time was being paid for by the sponsors, was a special employee of the sponsors (cf. Delisa v Arthur F. Schmidt, Inc., 285 N.Y. 314; see PJI 2:238, and comment), but that possibility, though dimly suggested in the county's papers, was not considered by the courts below and is not before us. To tax the carrier, however, with the obligation specifically to exclude coverage for damage to property which the printed provisions of its policy expressly *763 excludes is to turn the rule of Pimpinello v Swift & Co. (253 N.Y. 159) on its head, at least with respect to insurance carriers. There may be cases in which the facts would justify that result, but the county has not shown this to be such a case and absent such a demonstration the courts are not justified in rewriting the policy. Particularly is this so, in light of the fact that the policy was issued three days in advance of the exhibition, for it follows that, if presumptions are to be indulged, the policy presumably was available for review by the sponsors and the county beforehand but was not objected to by either.[2]Allison v National Ins. Underwriters (487 SW2d 257 [Mo]), relied on by the Appellate Division majority, is distinguishable because there the handling of nonowned property which the insured sought to bring within the exclusion was part of the coverage for which the insured had paid an extra premium and as to which the insurer had extended specific coverage.
Finally, the county's suggestion that the policy exclusion would only apply if it had exclusive control, as distinct from possession, of the automobile that was damaged affords no basis for denial of summary judgment to the carrier. It is not determinative, as the carrier suggests, that most of the cases on which the county relies involved real rather than personal property (Dubay v Trans-America Ins. Co., 75 AD2d 312, 318, mot for lv to app den 51 N.Y.2d 709; see, also, North Amer. Iron & Steel Co. v Isaacson Steel Erectors, 36 AD2d 770, 771, affd 30 N.Y.2d 640). It is rather, as pointed out in Dubay (supra; see, also, Ann., 8 ALR4th 563, 583), the nature of the property and the insured's relation to it which are determinative and which distinguish those cases. Thus in Greater N. Y. Mut. Ins. Co. v Professional Security Bur. (61 AD2d 975), Security Bureau, the insured, had no key to the building that was damaged, was not authorized to enter the building, and was subject to the orders of the owner's director of *764 security; in Neville v Continental Cas. Co. (26 AD2d 853) plaintiff, repairing a wheel on a trailer, was held not to have care, custody or control of the cargo on the trailer damaged by a fire started by plaintiff's use of a blowtorch, because the trailer driver remained in charge of the cargo and never relinquished the keys to the trailer; in Employers' Mut. Liab. Ins. Co. of Wis. v Puryear Wood Prods. Co. (247 Ark 673) the truck had been left on the insured's premises with the keys in it but under instruction, which the court found determinative, that insured was not to move the truck but to call the owner back if it was necessary to move it; and in Rochester Woodcraft Shop v General Acc. Fire & Life Assur. Corp. (35 AD2d 186) the trailer had been left on insured's premises without any obligation on the insured's part to guard or safely maintain it.
Though exclusivity of control will bring property within the exclusion, exclusivity is not a sine qua non of exclusion. The exclusion may be applicable whether the insured's control is exclusive or in conjunction with others (Hardware Mut. Cas. Co. v Mason-Moore-Tracy, Inc., 194 F.2d 173, 175-176; see Monari v Surfside Boat Club, 469 F.2d 9; International Derrick & Equip. Co. v Buxbaum, 240 F.2d 536; Cooke, Care, Custody or Control Exclusions, 1959 Ins LJ 7, 13), if the insured's relationship to the property is such as to constitute control. Having failed to contest the evidence presented by the carrier that the county undertook to provide security on both January 5 and 6, the county is in the position of arguing that, although it had so undertaken, although the arena and the car and other exhibition merchandise within it were in the exclusive possession of its security guard and although the keys to the car were known by the county's events co-ordinator to have been left in the car and, therefore, were likewise within the county's possession, the county's relationship to the car was not sufficient to constitute care, custody or control. The answer lies in the following quotation from Warner Corp. v Burns Int. Security Servs. (527 F.2d 1025, 1030; see, also, Ann., 8 ALR4th 563, 582) holding a watchman service to be within the exclusion, though there was no bailment to the guard service of the goods in the warehouse the service had contracted to guard: "The instant *765 case presents a situation where intimate physical handling is minimal, but the right and need to exclude others is inseparable from the nature of the protective service being rendered. There is nothing to suggest that at the time of the fire, Burns' power to exclude others from the warehouse was being shared with anyone else."
To deny applicability of the exclusion in this case is to impose upon the carrier liability for which it has not received a premium, and for a fault which is chargeable to the sponsors or to the county but not to the carrier. There should, therefore, be a reversal.
Order affirmed, etc.
NOTES
[1] As the Appellate Division correctly observed, this policy was not the typical "Owners, Landlord's and Tenants" one, the risk here being defined as "premises and operations" involved in "exhibitions in buildings  trade or educational exhibitions".
[2] In attempting to distinguish Greater N. Y. Mut. Ins. Co. v Professional Security Bur. (61 AD2d 975), Rochester Woodcraft Shop v General Acc. Fire & Life Assur. Corp. (35 AD2d 186) and Neville v Continental Cas. Co. (26 AD2d 853) on the ground that their findings of absence of control were based on a physical separation, the dissent loses sight of the fact that, while some separations may be spatial and others functional, the underlying principle is the same (see Dubay v Trans-America Ins. Co., 75 AD2d 312, 318, mot for lv to app den 51 N.Y.2d 709).
[3] Since this opinion does not turn on whether the backdoor guard was a general employee of the county or an ad hoc one of the sponsors, or on whether the policy procured by the sponsors complied with the licensing agreement, both referred to in the dissent, I have no occasion to treat with either.
[1] Appellant's brief in this court makes no issue of so much of the Special Term order as required it to pay the county's cost to defend up to July 23, 1981, the date of Special Term's decision. The county has contented itself with citing the dictum from Sturges Mfg. Co. v Utica Mut. Ins. Co. (37 N.Y.2d 69, 74), which supports that requirement. The propriety of that part of the order, therefore, is not considered.
[2] That the sponsors may not properly have met their obligation under the license agreement to provide property damage insurance for the county, if that be the result, is a matter between the sponsors and the county which cannot, however, affect the carrier's obligation absent a factual demonstration that the carrier represented that the policy issued met that contract obligation.